# Exhibit 1

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FIRST JUDICIAL DISTRICT

Case Type: Employment

| | |
|---|---|
| Scott D. Link, <br><br> Plaintiff, <br><br> vs. <br><br> Disciplined Growth Investors, Inc., Frederick Martin, Rick Martin, Robert Buss, and Robin Nicoski, <br><br> Defendants. | Court File No. _____ <br><br><br> **COMPLAINT** <br> **(JURY TRIAL DEMANDED)** |

Scott D. Link, by and for his Complaint against Disciplined Growth Investors, Inc. ("DGI"), Frederick Martin, Rick Martin, Robert Buss, and Robin Nicoski, alleges as follows:

## INTRODUCTION

1. This is an action by Scott D. Link for disability, marital status, and familial status discrimination, and retaliation. Mr. Link owns ██% of the voting stock of DGI and, until he took protected medical leave for a serious mental impairment in the fall of 2019, was employed by DGI as a Lead Portfolio Manager. Mr. Link labored tirelessly on behalf of DGI and built an extremely profitable portfolio, generating client revenue for DGI in excess of $██████ for 2017, in excess of $██████ for 2018, and in excess of $████ for the first half of 2019. Mr. Link performed his duties fully and faithfully and complied with all of his obligations to DGI.

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

2.      During Mr. Link's protected medical leave, however, Defendants informed Mr. Link they were stripping him of his decision rights as a senior member of the investment team, demoting him from Lead Portfolio Manager to the position of Equity Analyst, and significantly reducing his salary and bonus potential. In December 2019, in direct contravention of past practices and procedures for calculating his bonuses, Defendants paid Mr. Link a significantly reduced bonus for 2019, informing him they were doing so specifically because he took protected medical leave which caused him to be absent from the office for a portion of the year.

3.      When Mr. Link returned from his medical leave at the end of April 2020, Defendants refused to treat him as an employee. For instance, they refused to provide him with access to his DGI email account, DGI-supported databases and tools necessary to do his job, and VPN access to his DGI desktop. Instead, Defendants assigned Mr. Link two projects to complete remotely and informed him he would have to use publicly available resources to complete those projects, instructing that if he needed anything not in the public domain, he would have to ask another DGI employee to get it for him from DGI's databases. On May 5, 2020, just days after Mr. Link returned to work from medical leave, DGI chastised him for taking leave, telling him, "[a]lthough you have chosen not to work, all other employees have been working consistently throughout the past few months." In effect, DGI has done worse than demote Mr. Link to the position of Equity Analyst (a position he has not held since 1999). It has and continues to treat him as if he is not even a real employee, and as if he abandoned his position when he took medical leave.

2

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

## PARTIES

4.    Mr. Link is a resident of Hennepin County, Minnesota. Mr. Link owns ▇% of DGI's voting common stock and, until his recent demotion, was employed by DGI as a Lead Portfolio Manager.

5.    DGI is a Minnesota corporation headquartered in Minneapolis, Hennepin County, Minnesota. DGI is an investment adviser registered with the U.S. Securities and Exchange Commission. It is totally independent and 100% employee owned.

6.    Frederick Martin is a resident of Minnesota and is the Founder and President of DGI. Frederick Martin currently owns ▇% of DGI's voting common stock.

7.    Rick Martin is a resident of Minnesota and is the Chief Executive Officer of DGI. Rick Martin currently owns ▇% of DGI's voting common stock.

8.    Robin Nicoski is a resident of Minnesota and is a Lead Portfolio Manager for DGI. Robin Nicoski currently owns ▇% of DGI's voting common stock.

9.    Robert Buss is a resident of Minnesota and is the Director of Marketing & Client Relationships at DGI. Robert Buss currently owns ▇% of DGI's voting common stock.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over this matter because both Plaintiff and Defendants reside within Minnesota and because the wrongful actions by Defendants described herein took place in whole or in part within the state of Minnesota.

11.    Venue is proper within this Court because Mr. Link resides in Hennepin County; DGI has its principal place of business in Hennepin County; and the wrongful

3

actions by Defendants described herein took place in whole or in part within Hennepin County.

## BACKGROUND FACTS

**I.      DGI Hires Mr. Link, Who is Promoted to Lead Portfolio Manager and Generates Significant Revenue for the Company.**

12.      DGI was founded by Frederick Martin in February 1997. A few months after its founding, Mr. Link joined DGI as an Equity Analyst. He was elevated to Portfolio Manager in 1999, and to Lead Portfolio Manager in early 2017.

13.      As Lead Portfolio Manager, Mr. Link was incredibly successful and generated significant revenue for DGI. Not surprisingly, he garnered praise from all levels of DGI, including from its CEO, Founder and President, Directors of Client Relationships and Marketing, peers, and subordinates.

14.      For example, as publicly acknowledged by DGI's CEO, Defendant Rick Martin, "Scott [Link] probably has the best personal relationship skills of anyone in the company—which you don't expect from an analytical type."

15.      According to DGI Founder and President, Defendant Frederick Martin, "Scott [Link] is such a competitor, you have to kill him to beat him. He's great at identifying great stocks. He loves to beat Wall Street."

16.      DGI Portfolio Manager, Defendant Robin Nicoski, similarly praised Mr. Link as "like a tiger—fiercely competitive," adding that, "[h]e has a fire in the belly for this business that's contagious. He's a brilliant stock picker."

4

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

17.    According to Defendant Robert Buss, DGI Director of Marketing, "Scott [Link] is the most overtly competitive guy I've ever met in this industry. He loves the thrill of the hunt and he loves to outsmart Wall Street. He truly loves being in a position of confidence when he's right and everyone else is wrong."

18.    DGI Director of Client Relationships Sheri Lietzke further described Link as "very passionate about everything he does" and as someone who "wants to understand everything about the companies he's analyzing from A to Z."

19.    According to DGI Operations Team Leader Cindy Lee "[Mr. Link] has a mind like a steel trap – just an amazing grasp of numbers and details."

20.    DGI analyst Nicholas Hansen commends Mr. Link's excellent memory and industry know-how, stating, "[Mr. Link] can still talk in detail about a stock that he researched in the 1990s. He has very good intuition for retail stocks and a sense of crowds—how they think. He's very diligent at picking away at a stock and keeping all the relevant details of the company in his head."

21.    Consistent with this praise, Mr. Link generated significant revenue for DGI. In 2017, Mr. Link was one of the top revenue generators for DGI, generating revenue in excess of $█████████.

**II.    DGI's Other Owners Sell Shares to Mr. Link, Who Becomes Tied for Largest Shareholder.**

22.    Due to Mr. Link's valuable services to DGI, on January 1, 2018, Defendant Frederick Martin, who was the then-current largest shareholder in DGI with ████████

5

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

shares of voting common stock and ███ shares of non-voting common stock, sold ███ shares of his voting common stock to Mr. Link.

23.     On January 1, 2018, Defendant Frederick Martin also sold another ███ shares of DGI voting common stock to four other existing shareholders and three other new shareholders.

24.     Following Defendant Frederick Martin's stock sales on January 1, 2018, his DGI ownership dropped to ███ shares of voting common stock, or █%.

25.     Following Mr. Link's January 1, 2018 stock purchase, Mr. Link became tied with Defendant Nicoski as the largest owner of DGI, owning ███ shares, or █%, of DGI's voting common stock.

26.     Mr. Link fully expected that he would remain employed as a Lead Portfolio Manager for DGI and would retain a large ownership interest in DGI until his retirement at or after age 63. Indeed, he had no reason to doubt his employment at DGI would end before retirement based on his long history with DGI and his newly elevated placement as one of DGI's largest shareholders. In fact, DGI touts itself as "truly want[ing]" to be "the last place our people work."

27.     To date, Mr. Link remains one of the two largest owners of DGI's voting common stock, owning █%. DGI's other substantial owners include: Defendant Robin Nicoski, also owning █%; Defendant Frederick Martin, owning █%; Defendant Robert Buss, owning █%; and Defendant Rick Martin, owning █%.

**III.    DGI Begins Trying to Push Mr. Link Out of the Company.**

28.    In the summer of 2018, within weeks of Mr. Link having paid off in full the promissory note to Defendant Frederick Martin for Mr. Link's January 2018 stock purchase, Defendant Frederick Martin began having buyer's remorse.

29.    Realizing he could not force Mr. Link to give him back ownership of DGI, Defendant Frederick Martin concocted a scheme with Defendants Rick Martin, Robert Buss, and Robin Nicoski to push Mr. Link out of DGI. Because they could not attack Mr. Link's objective performance metrics as measured by revenue generation (as he was one of the highest revenue producers for DGI), the individual Defendants began questioning Mr. Link's subjective "engagement" and "commitment" to DGI.

30.    In fact, Mr. Link's "engagement" and "commitment" to DGI was exactly as it had been just a few months earlier when DGI's leadership decided that Mr. Link deserved to become one of the two largest shareholders in DGI.  Although there was no decrease in Mr. Link's "engagement" or "commitment," he suffered a messy divorce in 2012 and, finding himself as a single father with four kids, increasing through 2018 he began dedicating more time to his kids.  Mr. Link observed that DGI's other owners were unhappy any time he did not put his job first, including when he spent time with his family or took personal time.

31.    In March of 2018, Defendant Frederick Martin told Mr. Link that Mr. Link was "knocking the cover off the ball" with his successful performance at work.  Only two months later, Defendant Frederick Martin sharply criticized Mr. Link for buying a

7

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

motorcycle and questioned his commitment to the job.  DGI also criticized Mr. Link for playing in a band.

32.     Despite raising subjective, non-quantifiable concerns related to Mr. Link's "engagement" and "commitment" to DGI, at no time during Mr. Link's employment was he ever placed on any sort of written warning or formal corrective action plan.

33.     Throughout 2018, Mr. Link continued to generate significant revenue for DGI. In fact, Mr. Link's 2018 revenue for DGI was higher than his 2017 revenue, totaling in excess of $██████.

34.     Mr. Link's high level of performance continued into 2019. Halfway into 2019, Mr. Link's revenue total was $██████, which was, on information and belief, at least as high if not higher than the revenue generated by his peers.

35.     Despite Mr. Link's high revenue numbers, the individual Defendants continued their attempts to wrest control of DGI away from him, repeatedly criticizing his subjective "commitment" and "engagement," based largely on his status as a single father, but failing to provide any concrete objectives or measures for improvement.

**IV.     In October of 2019, Mr. Link Goes On Leave With Serious Mental Impairment, and DGI Discriminates Against Him, Retaliates Against Him for Taking Leave, and Strips His Job Responsibilities.**

36.     In September 2019, in large part due to the toxic environment at DGI created by the individual Defendants' attempts to oust him, Mr. Link began to suffer a serious mental impairment. By October 7, 2019, Mr. Link's mental impairment had deteriorated to the point where he was unable to work.

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

37.     On October 8, 2019, Mr. Link's sister telephoned Defendant Rick Martin to inform him that Mr. Link was experiencing a serious mental impairment and would be unable to return to the office, requesting that DGI accommodate Mr. Link by placing him on a medical leave of absence. Mr. Link followed up with Defendant Rick Martin by telephone on October 18, 2019, informing Defendant Martin that his mental impairment had become sufficiently severe that Mr. Link would be going to a 30-45 day in-patient treatment facility, and reiterating his request for a medical leave accommodation.

38.     Based on his communications with Defendant Rick Martin, Mr. Link understood that DGI had granted Mr. Link's request for a medical leave of absence as an accommodation for his serious mental impairment.

39.     Over the next several months, Mr. Link kept Defendant Rick Martin apprised of his progress, including informing him in November 2019 that Mr. Link required additional in-patient treatment. In response to Mr. Link's follow-up requests and medical certifications, DGI extended his medical leave of absence.

40.     Despite accommodating Mr. Link's need for leave, however, DGI and the individual Defendants began repeatedly and systematically discriminating and retaliating against Mr. Link because of his disability and because of Mr. Link's requested disability accommodations.

41.     In November 2019, during his protected medical leave, DGI took adverse action against Mr. Link, informing him that his serious mental impairment "necessitated that your decision rights as a senior member of the investment team be removed and that other members of the investment team be assigned to the DGI accounts you previously

9

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

handled." DGI further informed Mr. Link that it had "reassigned coverage of the stocks where he was the lead analyst."

42.     Also in November of 2019, even though Mr. Link was a DGI employee and shareholder, Defendants disabled Mr. Link's building and computer access. DGI told Mr. Link the reason for these adverse actions was because "you have been on leave." These actions had the effect of isolating Mr. Link from his own company and creating structural barriers to discourage Mr. Link from returning to work.

43.     In addition, for the first time in fifteen years, Defendants used a "qualitative" measure (as opposed to an objective "quantitative" measure) to calculate Mr. Link's 2019 bonus. Prior to 2019, Mr. Link's end-of-year bonus was nondiscretionary and was calculated by an objective, quantitative grid based on company revenues, portfolio performance, and individual stock performance. In 2017, this calculation resulted in a December 2017 bonus payment of $⬛⬛⬛⬛. In 2018, this calculation resulted in a December 2018 bonus of $⬛⬛⬛. In 2019, however, DGI abandoned this objective, quantitative bonus grid when calculating Mr. Link's bonus, instead paying him a "qualitative" bonus of only $⬛⬛⬛.

44.     Defendant Rick Martin explained to Mr. Link that since Mr. Link had been out on medical leave for part of 2019, "we are unable to quantitatively measure your performance results for the entire measurement period of calendar year 2019." Consequently, Defendant Rick Martin informed Mr. Link that Defendants had "decided to utilize a qualitative process" instead of the "quantitative process" that DGI had

10

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

previously used for Mr. Link. On information and belief, Mr. Link was the only DGI Portfolio Manager to be assessed using a qualitative rather than a quantitative process.

45.    In December of 2019, DGI became aware that Mr. Link's securities license was set to expire. Rather than inform Mr. Link of this information, on December 9, 2019, DGI directed the submission of a form U-5 to the Financial Industry Regulatory Authority ("FINRA") falsely stating that Mr. Link had voluntarily terminated his employment with DGI.

46.    Mr. Link did not learn that DGI had allowed his securities license to expire or that DGI had listed him as a "full termination" on his form U-5 until March 10, 2020, when he received a letter from ALPS Distributors, Inc. containing this information.

47.    In further discrimination for his disability and retaliation for his protected conduct, as the time for Mr. Link's return to work drew nearer, Defendants informed him that they were demoting him to the position of Equity Analyst—a position Mr. Link has not held for DGI *since 1999*. Defendants also informed Mr. Link they were reducing his base pay and bonus to that of an Equity Analyst, and Defendant Frederick Martin told him he would need to sell off his DGI shares so that his ownership interest was consistent with that of Equity Analyst. Although Mr. Link has asked DGI repeatedly for the requirements or timeframe when he would be restored to his pre-leave Lead Portfolio Manager position, DGI has not provided him with that information.

48.    Moreover, in its most recent distribution to Mr. Link, DGI only distributed $         , which is 35% less than the amount of the quarterly distribution received by Mr. Link for the same quarter last year, despite DGI's strong performance in 2019, which

11

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

was substantially up from its performance in 2018. On information and belief, this distribution was calculated by the individual Defendants in a manner to avoid paying Mr. Link substantial amounts he is entitled to given his stock position, in further retaliation for his protected medical leave and discrimination for his disability.

49.     Defendants' own statements to Mr. Link directly evidence their discriminatory and retaliatory intent. On March 13, 2020, Defendant Rick Martin admitted to Mr. Link that because Mr. Link "stopped coming to work" in order to attend in-patient treatment, "[w]e consider that you completely abandoned your fiduciary obligations to DGI clients and employees." Defendant Rick Martin also pointed out that DGI's decisions regarding Mr. Link's employment were based on the fact that he had "not performed these functions or had these responsibilities for approximately five months." In other words, Defendants' *admitted* motivation in demoting and mistreating Mr. Link is the fact that Mr. Link requested and took a medical leave of absence as an accommodation for his serious mental impairment. This is direct evidence of disability discrimination and retaliation.

50.     On information and belief, all of the individual Defendants contributed to, participated in, and approved of each of the adverse actions taken against Mr. Link.

**V.     DGI Continues to Retaliate Against Mr. Link By Refusing to Produce his Personnel File and Other Corporate Documents (to Which Mr. Link Is Statutorily Entitled), By Accusing Mr. Link of Violating his Legal and Ethical Obligations, and By Stripping Mr. Link of Tools Needed to Perform His Job.**

51.     On March 20, 2020, in an attempt to resolve DGI's mistreatment of Mr. Link, Mr. Link, by and through his attorneys, sent a letter to DGI's corporate

12

27-CV-20-6781

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

headquarters, addressed to Defendant Rick Martin in his capacity as CEO of DGI. That letter included a demand pursuant to Minnesota Statute Section 181.961 for an accurate and complete copy of Mr. Link's personnel file, which DGI was legally obligated to produce to Mr. Link within seven (7) working days of his request.

52.    In violation of Minnesota Statute Section 181.961, DGI failed to produce a copy of Mr. Link's personnel file within seven (7) working days. Only after Mr. Link threatened litigation if DGI did not produce his personnel file did DGI finally provide it to him.

53.    The March 20 letter also included a request pursuant to Minnesota Statute Section 302A.461, subd. 4, for copies of the following, which DGI was legally obligated to produce to Mr. Link within ten (10) days of its receipt of his request:

a.    DGI's articles of incorporation and all amendments currently in effect;

b.    DGI's bylaws and all amendments current in effect;

c.    A copy of DGI's current share register;

d.    DGI's audited financial statements for 2018;

e.    DGI's most recent interim financial statement or financial records underlying the March 13, 2020 shareholder distribution; and

f.    DGI's reports to shareholders in the last three years, including but not limited to all reports related to the setting of the Formula Market Value for 2016, 2017, and 2018.

13

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

54.     In violation of Minnesota Statute Section 302A.461, subd. 4, DGI also failed to produce within ten (10) days copies of DGI's articles of incorporation, bylaws, share register, audited financials for 2018, interim financials or financial records underlying the March 13, 2020 shareholder distribution, or DGI's report to shareholders in the last three years. To date, DGI still has not produced all of the requested documents. On information and belief, the reason for DGI's failure to produce these documents is that they would provide Mr. Link with further evidence that DGI is treating him unfairly, in discrimination and retaliation for his disability leave and other protected conduct.

55.     Since March 20, 2020, DGI has continued to retaliate against Mr. Link for engaging in protected conduct. Specifically, DGI: (1) threatened to end Mr. Link's employment if he did not agree to a recent offer of settlement; (2) reiterated its position that Mr. Link "abandoned his job" by taking medical leave to treat his mental impairment; and (3) accused Mr. Link of violating his legal and ethical obligations, company policies, and his shareholder obligations by accessing a DGI-provided iPhone application (FactSet) to look at publicly-available information about the historical stock performance of a publicly traded company.

56.     On April 24, 2020, with DGI's agreement that he could do so, Mr. Link returned to work. Mr. Link requested to return as a Lead Portfolio Manager, but DGI ignored and continues to ignore that request.

57.     When Mr. Link returned to work, DGI did not give him any tasks to perform. Instead, three business days after he returned, on April 28, Defendant Rick Martin wrote to Mr. Link and stated that the transition plan for Mr. Link to return to DGI

14

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

was not yet complete. DGI also notified Mr. Link that he would only be allowed to perform work using publicly available information and would need to request any additional data or information from other members of the investment team "complete with security protocols."

58.     On April 29, 2020, Defendants Frederick and Robin Nicoski assigned Mr. Link two projects, again insisting he complete those projects with only publicly available information, reaching out to one of them if he needed any "Wall Street research." Mr. Link responded by informing them he would need Wall Street research for both projects, as well as other DGI resources that are routinely available to all DGI employees, and requesting access to those resources. In response, Defendants refused to provide Mr. Link access to the resources he needed to complete the work it had assigned to him, instead directing him to contact them if he needed any specific nonpublic information, stating "you can direct the search from your home with our assistance." On information and belief, no other employee in the history of DGI has ever been denied direct access to these vital company resources and instead been directed to work through coworkers to obtain information necessary to complete basic work tasks.

59.     On April 30, 2020, Defendant Rick Martin emailed Mr. Link demanding he attend an in-person meeting on May 6, 2020, with Rick Martin, Peter Rieke, and "one or two senior members of the investment team" so they could "investigat[e] your recent attempt(s) to access FactSet."

60.     Despite the Minnesota Government's explicit directive not to hold in person meetings such as this due to the Coronavirus pandemic, Mr. Link initially agreed

15

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

to attend the meeting, believing that by May 6, 2020 Governor Walz's Order would have expired. Mr. Link emailed Mr. Martin, stating, "I have done nothing wrong, as your investigation has no doubt already revealed. Because I have done nothing wrong, please plan to also discuss at this meeting the transition plan for me to be restored to my pre-leave position of Lead Portfolio Manager." Mr. Link informed DGI that he would bring counsel with him to the meeting, expressed his anxiety that DGI was trying to create a situation where it could fire him, and requested DGI provide him in advance with any documents it intended to show him during the meeting or any questions it planned to ask.

61.    In response, DGI informed Mr. Link it did not intend to show him any documents, but simply wanted to give him the opportunity to explain his attempts to access FactSet. DGI also informed Mr. Link that although it scheduled 2 hours for the meeting, it believed the meeting could be completed "in a much shorter time period."

62.    After Governor Walz issued Executive Order 20-48, Mr. Link emailed Mr. Martin to inform him that Mr. Link did not believe an in-person meeting on May 6 was either safe or legally permissible under the new Executive Order and current COVID-19 pandemic guidance. Mr. Link pointed out that the guidance related to Walz's Order explicitly states under examples of what office employers cannot do: "Conduct meetings in conference rooms that don't allow for social distancing." To Mr. Link's knowledge, DGI does not have an office conference room big enough to accommodate safely the 5-6 people who would be attending the May 6 meeting. However, Mr. Link offered to meet at the same time on May 6 by either phone or video to answer any questions DGI had.

16

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

63.     In response, Defendants insisted that their meeting could not be conducted remotely, but offered to wait until May 19th to meet with Mr. Link in person.

64.     After Mr. Link accepted DGI's request to postpone the in-person meeting, DGI responded on May 5, 2020 by once again taking aim at his protected medical leave. Just *eleven days* after Mr. Link returned to work on April 24, 2020 from his medical leave, and in keeping with its prior barbs, Defendant Rick Martin told Mr. Link via email, "[a]lthough you have chosen not to work, all other employees have been working consistently throughout the past few months."  DGI also harassed Mr. Link for wanting to bring his attorney to the meeting scheduled by DGI to investigate him, stating, "Why do you feel it necessary to bring your attorney to an internal company meeting? This seems unusual, especially if you have not done anything wrong." Finally, DGI apparently reneged on its offer to postpone the meeting until May 19th, stating "We are prepared to go forward tomorrow as scheduled. Let me know if you plan to show up."

65.     Mr. Link responded by informing DGI that "[t]he reality is that there is an ongoing pandemic that is killing people, and my attorney and I are not comfortable attending a meeting in person tomorrow.  I accept your offer to postpone the meeting until May 19, and if you change your mind and want to meet via phone tomorrow morning, just let me know." To date, Mr. Link has heard nothing further about this meeting from DGI.

66.     On information and belief, DGI intends to use Mr. Link's attempts to access publicly available information on the DGI-provided FactSet iPhone application as

17

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

pretext for terminating his employment or permanently demoting him to Equity Analyst, in further retaliation for his medical leave and other protected conduct.

67.     To date, DGI still has not restored Mr. Link's access to his DGI email account, his DGI desktop, any DGI-issued databases or other tools necessary to do his job, or VPN remote access to any of these necessary items. On information and belief, DGI is setting Mr. Link up to fail, in the hopes that by treating him like an outsider, denying him access to necessary resources, and generally making his employment unbearable, it will force him to resign (or cause his performance to suffer to such an extent that termination or discipline is warranted) so that DGI does not have to invent a pretextual reason to fire him.

## CAUSES OF ACTION

### COUNT I
### Disability Discrimination in Violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 *et seq.*

#### *Against Defendant DGI*

68.     Plaintiff restates and realleges each of the foregoing allegations, which are incorporated herein by reference.

69.     The MHRA provides that it is an unfair employment practice to discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because of the employee's disability status. Minn. Stat. § 363A.08, subd. 2.

70.     A disabled person is anyone who: "(1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of

18

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

such impairment; or (3) is regarded as having such an impairment." Minn. Stat.

§ 363A.03, subd. 12. Plaintiff is an individual with a disability under the MHRA.

71.    During all relevant times, Defendant DGI and Plaintiff were "employer"

and "employee" within the meaning of the MHRA. Minn. Stat. § 363A.03, subds. 15 &

16.

72.    As described herein, Defendant DGI discriminated against Plaintiff based

on his disability in violation of the MHRA.

73.    As a direct and proximate result of Defendant DGI's unlawful conduct in

violation of the MHRA, Plaintiff has suffered harm, including past, present, and future

lost income, emotional distress, mental anguish, embarrassment, loss of reputation and

other damages in excess of $2.5 million.

74.    Plaintiff is also entitled to trebled damages and attorneys' fees and costs in

connection with this claim.

75.    Defendant DGI committed the above-alleged acts with malice, reckless

disregard or deliberate disregard for Plaintiff's rights and safety.

### COUNT II
### Familial Status and/or Marital Status Discrimination in Violation of the Minnesota Human Rights Act,
### Minn. Stat. §§ 363A.01 *et seq.*

### *Against Defendant DGI*

76.    Plaintiff restates and realleges each of the foregoing allegations, which are

incorporated herein by reference.

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

77.    The MHRA provides that it is an unfair employment practice to discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment because of the employee's familial status or marital status. Minn. Stat. § 363A.08, subd. 2.

78.    "Marital status" means whether a person is "single, married, divorced, [or] separated…" Minn. Stat. § 363A.03, subd. 24.

79.    "Familial status" means "the condition of one or more minors being domiciled with (1) their parent or parents or the minor's legal guardian or (2) the designee of the parent or parents or guardian with the written permission of the parent or parents or guardian." Minn. Stat. § 262A.03, subd. 18.

80.    During all relevant times, Defendant DGI and Plaintiff were "employer" and "employee" within the meaning of the MHRA. Minn. Stat. § 363A.03, subds. 15 & 16.

81.    Defendant DGI discriminated against Plaintiff based on his marital status and familial status in violation of the MHRA. Specifically, when Mr. Link became a single father and tried to spend more time with his kids, Defendant DGI began questioning Mr. Link's "commitment" to the company and scrutinizing his subjective "engagement" in ways that contributed to and caused Mr. Link severe mental distress and impairment.

82.    As a direct and proximate result of Defendant DGI's unlawful conduct in violation of the MHRA, Plaintiff has suffered harm, including past and future lost

27-CV-20-6781

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

income, emotional distress, mental anguish, embarrassment, loss of reputation and other damages in excess of $2.5 million.

83.     Plaintiff is also entitled to trebled damages and attorneys' fees and costs in connection with this claim.

84.     Defendant DGI committed the above-alleged acts with malice, reckless disregard or deliberate disregard for Plaintiff's rights and safety.

## COUNT III
### Reprisal in Violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 *et seq.*

### *Against All Defendants*

85.     Plaintiff restates and realleges each of the foregoing allegations, which are incorporated herein by reference.

86.     The MHRA prohibits any individual who participated in the alleged discrimination as a perpetrator or an employer from engaging in reprisal against any person because that person engaged in protected activity. Minn. Stat. § 363A.15.

87.     A reprisal under the MHRA "includes, but is not limited to, any form of intimidation, retaliation, or harassment," as well as to "depart from any customary employment practice; transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status." Minn. Stat. § 363A.15.

88.     Requesting a reasonable accommodation specifically for a known disability is protected activity under the MHRA.

21

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

89.     Plaintiff engaged in protected activity by requesting a medical leave of absence as an accommodation for his known disability.

90.     Complaining of discrimination and/or retaliation is also protected activity under the MHRA.

91.     Plaintiff engaged in protected activity by complaining to DGI that he believed DGI was discriminating and retaliating against him for taking medical leave for his disability.

92.     Plaintiff further engaged in protected activity by raising concerns that a meeting schedule by DGI for May 6, 2020 was a violation of Governor Walz's Executive Order 20-48.

93.     As described herein, Defendants violated the MHRA by engaging in reprisal against Plaintiff because he requested, and took, a medical leave of absence for a known disability, and because he complained to DGI that he believed it was discriminating and retaliating against him for taking a protected medical leave.

94.     As described herein, DGI took several actions against Mr. Link because he engaged in protected activity that discouraged Mr. Link, and that would discourage any reasonable employee, from engaging in further protected conduct.

95.     As a direct and proximate result of Defendants' unlawful conduct in violation of the MHRA, Plaintiff has suffered harm, including past and future lost income, emotional distress, mental anguish, embarrassment, loss of reputation and other damages in excess of $2.5 million.

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

96.     Plaintiff is also entitled to trebled damages and attorneys' fees and costs in connection with this claim.

97.     Defendants committed the above-alleged acts with malice, reckless disregard or deliberate disregard for Plaintiff's rights and safety.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Scott D. Link prays for judgment against Defendants as follows:

1.      That the practices of Defendant DGI complained herein be determined and adjudged to constitute disability, marital status, and/or familial status discrimination in direction violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 *et seq.*

2.      That the practices of all Defendants complained of herein be determined and adjudged to constitute reprisal in direct violation of the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01 *et seq.*

3.      That Plaintiff be awarded all legal, equitable, injunctive, and declaratory relief available under the Minnesota Human Rights Act, §§ 363A.01 *et seq.*, including trebled damages, in an amount to be determined at trial, with interest on such amount.

4.      For compensatory damages, including loss of past, present, and future income, benefits, and other damages in an amount in excess of $2.5 million, as well as prejudgment and postjudgment interest.

5.      For an Order compelling Defendant DGI to produce to Plaintiff all of the documents to which he is entitled under Section 302A.461 of the Minnesota Business Corporations Act.

23

6.      For Plaintiff's attorneys' fees, costs, and disbursements.

7.      For a jury trial.

8.      For such other further and other relief as the Court deems just and

equitable.

Dated:  May 7, 2020                          DORSEY & WHITNEY LLP


By  /s/ JoLynn M. Markison          .
        JoLynn M. Markison (#0386876)
        markison.jolynn@dorsey.com
        Andrew James (#0390982)
        james.andrew@dorsey.com
    50 South Sixth Street, Suite 1500
    Minneapolis, MN 55402
    Telephone:  (612) 340-2600
    Facsimile:  (612) 340-2868

    Attorneys for Plaintiff Scott D. Link

24

Filed in District Court
State of Minnesota
5/7/2020 4:03 PM

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that sanctions may be imposed under Minn. Stat. § 549.211.

DORSEY & WHITNEY LLP

/s/ JoLynn M. Markison
JoLynn Markison