Robert V. Prongay (SBN 270796)
*rprongay@glancylaw.com*
Casey E. Sadler (SBN 274241)
*csadler@glancylaw.com*
Pavithra Rajesh (SBN 323055)
*prajesh@glancylaw.com*
**GLANCY PRONGAY WOLKE & ROTTER LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiffs and Lead Counsel for the Putative Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RAVI KRISHNAMOORTHY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SEMLER SCIENTIFIC, INC., DOUGLAS MURPHY-CHUTORIAN, ANDREW B. WEINSTEIN, and RENAE CORMIER,<br><br>Defendants. | Case No. 5:25-cv-07303-PCP<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

Page


I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES AND RELEVANT NON-PARTIES .......... 4

IV. SUBSTANTIVE ALLEGATIONS .......... 6

A. Background .......... 6

1. At All Relevant Times, Semler Primarily Generated Revenue From One Medical Device .......... 6

2. Semler Brought Quantaflo To Market Using A Lenient Regulatory Pathway .......... 7

3. Capitated Payments Under Medicare Advantage Are Awarded Based In Part On The Severity Of Patients' Conditions .......... 9

4. The False Claims Act Imposes Liability For Seeking Medicare Payments Using Falsified Information .......... 10

B. The Company's Marketed QuantaFlo To Insurers As A Means To Increase Medicare Advantage Payments .......... 11

C. CMS And UHG Prohibited Reimbursement For The Photoelectric Plethysmography Technology Used By QuantaFlo .......... 14

D. Defendants Knew That QuantaFlo Did Not Qualify For Reimbursement, Yet Actively Represented To Providers That They Could Be Reimbursed For The Tests .......... 15

E. During The Class Period, Semler Reported Remarkable Growth And Presented As Hypothetical The Risk That The Company Could Be Subject To Enforcement Action For FCA Violations .......... 17

F. After CMS Changed Risk Adjustments For PAD, Semler Pivoted Its Business Model To Invest In Bitcoin .......... 19

G. Semler Reveals That It Had Been Subject To A Years-Long Investigation For FCA Violations And Settled The Claims For About $30 Million .......... 21

H. Unable To Support Medical Sales After CMS's Rule Change And The DOJ Settlement, Semler Is Acquired For Its Bitcoin .......... 25

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......... 25

A. Statements About Reimbursement Codes .......... 25

B. Risks About Medicare Reimbursement and FCA Violations .......... 32

C. Semler Never Disclosed That It Was Subject To A DOJ Investigation For FCA Violations ....39

VI. LOSS CAUSATION ....40

VII. ADDITIONAL SCIENTER ALLEGATIONS ....41

VIII. CORPORATE SCIENTER ALLEGATIONS ....43

IX. CLASS ACTION ALLEGATIONS ....44

X. UNDISCLOSED ADVERSE FACTS ....45

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....46

XII. NO SAFE HARBOR ....48

XIII. CLAIMS ....48

XIV. PRAYER FOR RELIEF ....52

XV. JURY TRIAL DEMANDED ....52

Lead Plaintiff Scott Link and Additional Plaintiff Sidney Woodbury (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Semler Scientific, Inc. ("Semler" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Semler; and (c) review of other publicly available information concerning Semler, including the public filings in the qui tam action captioned *United States ex rel. Kane v. Semler Scientific, Inc.*, Case No. 3:16-cv-1516 (M.D. Fla.).[1]

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Semler common stock between March 10, 2021 and April 15, 2025, inclusive (the "Class Period"). Plaintiffs pursue claims against Defendants (as defined herein) under the Securities Exchange Act of 1934 (the "Exchange Act").

2. During the Class Period, Semler was a medical device company that primarily generated revenue by sales of QuantaFlo, a device that measures blood flow using infrared light (a process called photoelectric plethysmography). According to the Company, QuantaFlo was used to diagnose peripheral artery disease ("PAD") and was cheaper and easier than the traditional method of diagnosis, an ankle brachial index ("ABI").

3. According to the Mayo Clinic, PAD is a "common condition" where narrowed arteries reduce blood flow, usually in the legs. It is often caused by a buildup of fats, cholesterol and other substances in the arteries. Symptoms range from leg or muscle pain in the extremities to numbness that can make it harder for patients to exercise, sleep, or rest. Risk factors include diabetes, high blood pressure, high cholesterol, increasing age especially after 65, obesity, and smoking.

[1] The qui tam lawsuit has been pending 2016, but its filings are sealed. Only filings after Semler's settlement with the U.S. Department of Justice in September 2025 are public.

4. Defendants publicly stated that Semler's sales strategy was to target Medicare Advantage organizations. Defendants claimed that capitated payments from the Centers for Medicare and Medicaid ("CMS") provided "a financial incentive to identify those Medicare patients that are sicker, including those that have undiagnosed ailments such as PAD." Semler's largest customer was a "diversified healthcare company and its affiliates" that accounted for more than 40% of revenue until fiscal 2023.

5. But Defendants failed to disclose that they executed this sales strategy by marketing that QuantaFlo was reimbursable under certain codes. That marketing strategy was improper because those codes required the provider to perform an ABI (which QuantaFlo did not) and CMS had a well-established policy that photoelectric plethysmography (QuantaFlo's technology) was not reliable.

6. Defendants had been informed years before the start of the Class Period that QuantaFlo did not qualify for reimbursement. As the investing public learned through a settlement between Semler and the Department of Justice ("DOJ") in 2025, "FDA employees told Semler [in 2015] that QuantaFlo uses photoplethysmography, did not perform an ABI, and could not be called a 'digital ABI.'" Thus, Defendants knew that QuantaFlo did not perform the service to qualify for reimbursement under the codes available for PAD screening.

7. By marketing QuantaFlo as reimbursable under these codes anyway, Semler aided and facilitated the submission of false reimbursement claims to CMS, exposing the Company to liability under the False Claims Act. In fact, Semler had been under investigation by the DOJ since 2017 for potential violations of the False Claims Act. The Company responded to multiple civil investigative demands for information and documents about Semler's marketing and sales strategy. That is, Semler's entire revenue model rested on a practice that had been the subject of an undisclosed federal investigation since 2017.

8. None of this was disclosed to investors. In public statements, Defendants acknowledged that QuantaFlo is "generally but not specifically approved for any reimbursement code" and claimed that customers have been "reimbursed by third-party payors consistently for procedures using a variety of different codes." However, these statements left out that Defendants

told customers about which reimbursement codes had been successfully used to receive reimbursements, such that the marketing materials misleadingly implied to customers that these reimbursement codes were proper. Defendants also stated as hypothetical that Semler could be subject to a review of its compliance with healthcare fraud and abuse laws and regulations and that such a review "could" have an adverse effect on the business, when in fact Semler had already been under investigation for years.

9. On February 28, 2025, after the market closed, Semler revealed for the first time that it had been under investigation since 2017 for False Claims Act violations. The Company stated that it had "cooperated with the investigation, along with subsequent CIDs [civil investigative demands] received in February 2019, December 2021, April 2022 and April 2023." Earlier that month, Semler had engaged in settlement discussions with the DOJ that were not successful. On this news, the Company's stock fell $4.03, or 9.39%, to close at $38.89 on March 3, 2025.

10. Then, on April 15, 2025, after the market closed, Semler revealed that it had settled claims with the DOJ for $29.75 million. On this news, the Company's stock fell $3.40, or 9.88%, to close at $31.00 per share on April 16, 2025.

11. On September 10, 2025, the terms of the settlement were made public (the "DOJ Settlement").[2] Therein, the DOJ contended that Semler violated the FCA from 2010 to 2024 "by knowingly causing, and conspiring to cause, the submission of false claims to Medicare Part B for tests performed using the FloChec and QuantaFlo devices." The devices did not satisfy reimbursement codes "because they do not perform an ABI" and because CMS rules "prohibit reimbursement for noninvasive vascular tests that use photoplethysmography because of concerns about accuracy and reproducibility." The DOJ also settled FCA claims with one of Semler's distributors, and that settlement agreement revealed that Semler required that distributor's marketing materials to represent that QuantaFlo tests were reimbursable.

[2] The DOJ Settlement concerned false fee-for-service Part B claims submitted by physicians, not capitation payments to Medicare Advantage plans.

12. After a CMS change reduced the capitation payments for most PAD diagnoses and after the DOJ Settlement removed Semler's ability to market QuantaFlo as reimbursable, Semler could no longer entice third-party payors to use QuantaFlo, and its revenue fell off a cliff. Unable to sustain itself on its only product, the Company pivoted to invest in Bitcoin and announced a deal to be acquired by Strive, a bitcoin treasury asset management company.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

17. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

18. Lead Plaintiff Scott Link, as set forth in his previously filed certification (Dkt. No. 19-2), incorporated by reference herein, purchased Semler common stock during the Class Period,

and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Additional Plaintiff Sidney Woodbury, as set forth in his previously filed certification (Dkt. No. 15-2), incorporated by reference herein, purchased Semler common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20. Defendant Semler is incorporated under the laws of Delaware with its principal executive offices located at 51 E Campbell Ave, Suite 107-D, Campbell, CA 95008. Until January 16, 2026, its common stock traded on the NASDAQ exchange under the symbol "SMLR." In January 2026, it became a wholly owned subsidiary of Strive, Inc.

21. Defendant Douglas Murphy-Chutorian ("Murphy-Chutorian") was Semler's CEO from October 2012 to April 3, 2023 and from April 27, 2023 through January 2026. He was a director from September 2012 to January 2026. He was Semler's President from April 27, 2023 to January 2026 and interim CFO from November 1, 2025 to January 2026.

22. Defendant Andrew B. Weinstein ("Weinstein") served as Semler's Vice President, Finance and Accounting (the Principal Financial Officer) from 2018 to July 10, 2023.

23. Defendant Renae Cormier ("Cormier") served as Semler's CFO from July 10, 2023 to October 30, 2025. Prior to that, she was the head of corporate communications and business strategy at Semler.

24. Defendants Murphy-Chutorian, Weinstein, and Cormier (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the

public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

25. Non-party Dennis Rosenberg ("Rosenberg") served as Semler's Chief Marketing Officer from 2013 to August 2023.

26. Non-party Wayne Pan ("Pan") served as Semler's CEO from April 3, 2023 to April 27, 2023. He was a director of Semler from 2014 to April 27, 2023.

27. CW 1 was the Vice President of Finance of Semler from 2010 to late 2023. He[3] reported to Defendant Weinstein and had regular one-on-one phone calls with Defendant Murphy-Chutorian.

28. CW 2 was a Regional Account Manager from 2019 to August 2022. As a salesperson, CW 2 pitched QuantaFlo to primary care providers by describing the device and its purpose, demonstrating how the device works, and discussing reimbursement. He reported up to Vice President of Strategic Sales and attended meetings with Chief Operating Officer ("COO") Jennifer Herrington ("Herrington").

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. At All Relevant Times, Semler Primarily Generated Revenue From One Medical Device

29. Semler's first patented product was called FloChec, a 4-minute in-office blood test that measures blood flow using infrared light. Semler received FDA clearance for FloChec in 2010 and began commercially releasing the product in January 2011. The Company shifted to its next-generation of FloChec, a product called QuantaFlo, after receiving FDA clearance in March 2015. At all relevant times, Semler's revenue was derived primarily from QuantaFlo.[4]

30. Both FloChec and QuantaFlo operate using a process called photoelectric plethysmography. A sensor clamp is placed on the patient's toe or finger, infrared light is transmitted

[3] All former employees are defined using the masculine pronoun to protect their anonymity.

[4] The Company sometimes recognized modest revenue from distributing other private companies' products.

from the sensor and reflected by red blood cells, and the returning light is detected by the sensor. This process takes 30 seconds and is repeated on both index fingers and both large toes of the patient. The Company's proprietary algorithm uses this data to construct a "blood flow waveform" for each digit. A hardcopy report displays the four waveforms and a ratio of each leg measurement compared with the arms, and it classifies the results as either "Flow Obstruction" or "No Flow Obstruction."

31. The traditional method to measure blood flow is by measuring blood pressure using an ankle brachial index ("ABI") with Doppler test. Though blood flow reflects the rate at which blood is delivered to a particular area and blood pressure is the force exerted by circulating blood, the two bear a proportional relationship. Thus, blood pressure is measured using a cuff and a Doppler device on the four extremities, and widely accepted criteria for the ratio of blood pressure in the legs and arms is used to determine whether there is a flow obstruction.

32. Semler boasted that QuantaFlo was better than the other methods in time, expense, and skill. For example, Semler's annual reports stated that ABI tests take "15 minutes to perform and require a vascular technician to be done properly" and that other imaging methods "are much more expensive and are performed by specialists in special laboratories or offices."

### 2. Semler Brought Quantaflo To Market Using A Lenient Regulatory Pathway

33. FloChec and QuantaFlo were cleared by the FDA under Section 510(k) of the Food, Drug, and Cosmetic Act (the "FD&C Act").

34. The 510(k) pathway is a premarket submission that must show the device is "substantially equivalent" to a legally marketed device (or predicate device). According to the FDA, a device is "substantially equivalent" to its predicate device if it either: (a) has the same intended use and technological characteristics as the predicate; or (b) has the same intended use and different technological characteristics but is demonstrated to be as safe and effective as the predicate.

35. Because it is intended to be a faster, less burdensome path to market low- to moderate-risk medical devices, the 510(k) submission is subject to a less demanding standard of review than an application for Premarket Approval under Section 515 of the FD&C Act. Premarket Approval requires clinical trial data and non-clinical laboratory testing to demonstrate that the

medical device is safe and effective, and the FDA's experts in that field scrutinize the study design, study conduct, data analyses, adverse reactions, patient information, and patient complaints when deciding whether to approve the application. By contrast, a 510(k) can rely on nonclinical and biomechanical tests, as well as descriptive analyses, to show that the device is "substantially equivalent" to an already-marketed device.

36. Due to this limited review, clearance through the 510(k) pathway "does not in any way denote official approval of the device." 21 C.F.R. § 807.97. "Any representation that creates an impression of approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding." *Id.*

37. In its 510(k) submission, Semler claimed that FloChec was substantially equivalent to another device cleared through the 510(k) pathway, the Hokanson EC-6 Plethysmograph.[5] Only a summary appears to be publicly available, and it does not suggest that any clinical data was submitted in support of its submission. According to the summary, "[t]esting was conducted to determine if the FloChec Photoplethysmography Device provides a visual representation of the PPG wave form in the extremities." FloChec's indicated use was to "monitor relative blood flow changes distal to the occlusion of a brachial, radial, ulnar, or femoral artery" when the patient experiences "unexplained pain or claudication discomfort in an extremity." The 510(k) summary stated that the "FloChec Device is not for diagnosis nor is it indicated for the treatment, prevention, cure or mitigation of a disease."

38. Five years later, Semler claimed that QuantaFlo was substantially equivalent to FloChec, stating that QuantaFlo used plethysmography to measure blood volume changes to "calculate[] a result that is predictive of Peripheral Arterial Disease (PAD)." QuantaFlo and FloChec use "the same technology" in that they use plethysmography to measure blood volume, digitize that signal, and process them using an algorithm "to calculate a result." Semler claimed that QuantaFlo had demonstrated "substantially equivalent accuracy" in diagnosing PAD as compared to the ABI

[5] The application was submitted by Semler's predecessor entity, Advanced Vascular Dynamics, and overseen by the Company's co-founder, Herbert Semler.

method. The Company stated that "[a]mong six clinical sites, QuantaFlo was 80.2% accurate (n=333 limbs) and Doppler ABI was 79.3% accurate (328) limbs."

39. The intended use of QuantaFlo was to aid the diagnosis and monitoring of PAD. Specifically, Semler's 510(k) submission stated:

> QuantaFlo is intended to aid clinicians in the diagnosis and monitoring of Peripheral Arterial Disease. It provides bilateral, non-invasive physiologic studies of the upper and lower extremity arteries, using volume plethysmography of the posterior tibial and anterior tibial/dorsalis pedis arterial distributions. Additionally, QuantaFlo may be used to perform bilateral, non-invasive physiologic studies of the upper and lower extremity arteries with provocative functional maneuvers.

40. Based on Semler's submission purportedly demonstrating the accuracy of diagnosing PAD, the FDA cleared QuantaFlo to be marketed. Semler commercialized QuantaFlo in late 2015.

**3. Capitated Payments Under Medicare Advantage Are Awarded Based In Part On The Severity Of Patients' Conditions**

41. Medicare Advantage allows Medicare-eligible seniors and beneficiaries with disabilities to obtain care through private plans rather than traditional fee-for-service Medicare. The Centers for Medicare and Medicaid Services ("CMS") pays a fixed (or capitated) monthly amount per enrolled beneficiary to provide Medicare benefits. These capitated payments are made to Medicare Advantage Organizations (or "MAOs"), i.e. insurers.

42. These capitated payments are calculated using a risk adjustment process to spread healthcare costs such that plans with healthier populations compensate plans with more costly enrollees (i.e., plans with low actuarial risk compensate those with high actuarial risk). Spreading healthcare costs encourages plans to compete for beneficiaries based on price and quality rather than health status.

43. The risk adjustment process calculates capitated payments based on demographics (age and gender) and health status (claims data). Providers submit ICD-10-CM diagnostic codes to MAOs, and each MAO aggregates the diagnosis codes across its members to submit hierarchical condition category ("HCC") codes to CMS. The agency uses the HCC codes to estimate the expected costs of care and assigns a risk adjustment factor accordingly. A more severe condition leads to a higher risk adjustment factor to reflect the higher expected cost of healthcare, which in turn can lead to higher capitated payments to that MAO.

44. Until March 2023, vascular diagnoses such as PAD were part of HCC 107 (Vascular Disease with Complications) or HCC 108 (Vascular Disease). Generally speaking, each of these codes increased the risk adjustment factor, resulting in a higher capitated payment. MAOs received up to $3,000 annually for a positive PAD diagnosis.

**4. The False Claims Act Imposes Liability For Seeking Medicare Payments Using Falsified Information**

45. By compensating MAOs with higher payments for more severe diagnoses, the capitated payments can inadvertently incentivize medical providers to exaggerate an enrollee's health risks, and MAOs have historically coded aggressively to capture every valid HCC-mapped diagnosis.

46. To curb such practices, regulations provide that, "[a]s a condition for receiving a monthly payment," the MAOs must certify "(based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of relevant data that CMS requests." 42 C.F.R. § 422.504(*l*).

47. This certification requirement is enforced using the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. Under the FCA, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the federal government for civil penalties and treble damages. 31 U.S.C. § 3729(a)(1). Knowledge includes deliberate ignorance or reckless disregard of the truth or falsity of the information, but does not require specific intent to defraud. 31 U.S.C. § 3729(a)(1)(A)-(B).

48. Civil penalties range from $14,308 to $28,619 for violations after November 2015. *See* 28 C.F.R. § 85.5.

49. In annual reports filed with the SEC, Semler acknowledged that it must comply with the FCA. For example, the fiscal 2020 annual report stated, in relevant part:[6]

> Our operations may be subject to federal and state healthcare laws and regulations including fraud and abuse laws, such as anti-kickback and false claims laws, data privacy and security laws and transparency laws related to payments and/or other

[6] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

> transfers of value made to physicians and other healthcare professionals and teaching hospitals.
>
> The federal Anti-Kickback Law . . . .
>
> Additionally, the civil False Claims Act prohibits knowingly presenting or causing the presentation of a false, fictitious or fraudulent claim for payment to the U.S. government. Actions under the False Claims Act may be brought by the Attorney General or as a qui tam action by a private individual in the name of the government. The federal government is using the civil False Claims Act, and the accompanying threat of significant liability, in its investigations of healthcare providers and suppliers throughout the country for a wide variety of Medicare billing practices and has obtained multi-million and multi-billion dollar settlements in addition to individual criminal convictions. In addition, off-label promotion has been pursued as a violation of the federal False Claims Act. Pursuant to FDA regulations, we can only market our products for cleared or approved uses. Although physicians are permitted to use medical devices for indications other than those cleared or approved by the FDA based on their independent medical judgment, we are prohibited from promoting products for such off-label uses. ***Given the significant size of actual and potential settlements, it is expected that the government will continue to devote substantial resources to investigating healthcare providers' and suppliers' compliance with the healthcare reimbursement rules and fraud and abuse laws***.

50. Thus, Defendants understood that Semler was subject to the FCA even though it is not a medical provider or MAO.

**B. The Company's Marketed QuantaFlo To Insurers As A Means To Increase Medicare Advantage Payments**

51. Semler does not require a down payment, long-term commitment, or maintenance contract or fees from its customers. Rather, Semler generates revenue using a license model based on the use rates of QuantaFlo and third-party payment rates to physicians and facilities who used the product. About 60% of customers are on a fixed-fee software licensing model that charges about $6,000 per year for the testing software, and the remainder are on a variable fee model that charges per test where the price is based on the number of tests performed.

52. As Semler publicly acknowledged, capitated payments provided a financial incentive to increase the number of tests performed using QuantaFlo. In annual reports filed with the SEC, Semler stated that the capitated payments administered by CMS provided "a financial incentive to identify those Medicare Advantage patients that are sicker, including those that have undiagnosed ailments such as PAD."

53. Because the capitated payments were issued to MAOs rather than device companies, Semler decided to target insurers as a means to increase QuantaFlo usage. Semler concluded that

"insurance plans that have a high number of Medicare Advantage patients are the primary target market for QuantaFlo, along with other medical personnel who care for those older that 50 years (such as home health care providers)." The Company used census data to estimate that 80 million Americans could be evaluated for PAD and, to capitalize on this market, "target[ed] customers with patients at risk of developing PAD."

54. According to a former Semler employee cited in the qui tam lawsuit, Semler achieved this by representing to MAOs that QuantoFlo could increase diagnoses of PAD, which would then result in higher capitated payments. An insurer could receive up to $3,000 in capitated payments from a single enrollee diagnosed with PAD.

55. This is corroborated by management's own statements. At the 20th Annual Needham Healthcare Conference in April 2021, an analyst asked about the pricing model to insurers, and Rosenberg explained that it was highly profitable for insurers to use QuantaFlo. He stated, in relevant part:

> Medicare Advantage health plans . . . license systems from us and they place them in doctor's offices and that's a fixed license that they pay on a monthly or annual basis.
>
> And it's not based on usage. ***There is a high return for them in terms of cost savings and Medicare Advantage reimbursement***, but it's not – ***our license fee is not based on the amount of usage that they have. That's our fixed fee license model.*** And that covers a large percent of these Medicare Advantage members, who are coming into doctors' offices and clinics to have these types of tests done annual wellness exams, et cetera, but there is also a portion of these Medicare Advantage members who for whatever reason don't come into the doctor's office routinely and that may be their elderly, mobility issues, transportation challenges and now more recently, fear of COVID.
>
> And so the way that the health plans reach that portion of their population is by contracting with health risk assessment companies who go in and home visits and charge the health plans on a per-visit basis for that segment of the business and this is where our portable and easy to use system really makes a lot of sense because they can bring this right in with them to these home test. ***For that portion of the business, they charge the health plans by per visit. So we charge on a fee per test basis for that portion of the business***, but the important thing is well a, all of the test results come into our servers. So we know what testing is going on where.

56. Similarly, months later during the third quarter 2021 earnings call on November 1, 2021, Defendant Murphy-Chutorian directly stated that Semler is "targeting HCC codes," and Rosenberg stated that "HCC codes are important and obviously played a key role in what we're

doing with QuantaFlo." During the 21st Annual Needham Virtual Healthcare Conference on April 13, 2022, Rosenberg stated that "The really low hanging fruit is the risk adjustment from Medicare Advantage. So I think that's been the focus" for Semler. Analysts took note; for example, Lake Street Capital Partners wrote on May 12, 2022 that "management highlighted both the numbers related to the size of its [PAD] market and the powerful economic proposition QuantaFlo offers Medicare Advantage health plans."

57. Semler incentivized MAOs to use QuantaFlo to diagnose PAD because it would (and did) enable insurers to receive higher capitated payments from CMS. For example, during the third quarter 2022 earnings call held on November 1, 2022 (the "3Q22 Earnings Call"), Defendant Cormier stated that Semler had reached a "volume pricing milestone with a large customer" and that "incentivizing the large customers to increase volumes is good for our business and our product stickiness."

58. Analysts understood that the additional payments from CMS enabled Semler's sales. For example, during the 3Q22 Earnings Call, an analyst from Lake Street Capital Partners stated that the "key selling point for the PAD testing is the availability of incremental health premiums for Medicare Advantage health plans." Additionally, Lake Street Capital Partners repeatedly "justified" its price targets for the stock price during the Class Period partly because "Semler's current business focuses on just 1 of the 500 medical conditions for which CMS pays Medicare Advantage plans elevated premiums for members and treated proactively." Similarly, Colliers Securities reiterated a buy rating in November 2021 because "SMLR's flagship product, QuantaFlo for the detection of peripheral arterial disease (PAD), is in the early stages within Medicare Advantage (MA)."

59. This strategy worked, and insurers accounted for the largest portion of Semler's revenue. For fiscal 2020, 2021, and 2022, a "diversified healthcare company and its affiliated plans" accounted for 47.2%, 40.8%, and 40.4% of total revenue, respectively. Though Semler did not identify this customer, public reporting suggests that the healthcare company is UnitedHealth Group, Inc. ("UHG") and its affiliates. According to the qui tam action, UHG purchased or leased QuantaFlo devices for $600 per month and paid a $50 fee per test to Semler.

60. UHG used QuantaFlo because of the potential for capitated payments from CMS. UHG's subsidiary Optum, Inc. ("Optum") had conducted a study that concluded that PAD diagnoses of enrollees without acute symptoms or complications were especially lucrative. Optum submits risk adjustment data to CMS. It conducted a study and found that a PAD diagnosis could result in an *additional* monthly reimbursement of $100 to $430 depending on the severity of PAD and type of enrollee.

61. Optum also financed a study to justify using QuantaFlo to screen for PAD in a Medicare Advantage population (the "Nevada Paper"). One of Optum's subsidiaries, Optum Labs, is a research and innovation arm that provides grants to academic institutions. Those grant recipients published an article in June 2022 in the Journal of Vascular Surgery compiling Optum's patient data in Nevada since 2016 to conclude that a positive screening result for PAD was associated with short- and long-term increased risks of mortality and major adverse cardiovascular events for individuals older than 65.

62. Rosenberg cited the Nevada Paper during Semler's first quarter 2022 earnings call on May 2, 2022, stating: "The Nevada Paper justifies screening asymptomatic patients in the Medicare Advantage population using QuantaFlo, thus supporting why CMS pays extra so that these patients can be properly cared for." During the second quarter 2022 earnings call, Defendant Cormier similarly claimed the Nevada Paper "underscor[es] the benefits of using QuantaFlo on asymptomatic patients" and that these results "should be compelling to have more customers adopt" QuantaFlo. Defendant Murphy-Chutorian stated that the study is "very convincing" for payors who had considered QuantaFlo to be "experimental." These types of statements led Lake Street Capital Partners to issue a note in March 1, 2022 stating that the results of the Nevada Paper "may drive further adoption of QuantaFlo by existing and new customers over time."

**C. CMS And UHG Prohibited Reimbursement For The Photoelectric Plethysmography Technology Used By QuantaFlo**

63. Under its authority to administer Medicare programs, CMS renders determinations of the scope of coverage for particular devices, which is reflected through a National Coverage Determination ("NCD"), based on whether the medical service is "reasonable and necessary." NCD

20.14 recognizes that some plethysmography methods are "of value as a noninvasive technique for diagnostic, preoperative and postoperative evaluation of peripheral artery disease[.]" However, it also states that photoelectric plethysmography is "still considered experimental" and has "not yet reached a level of development such as to allow their routine use in the evaluation of suspected peripheral vascular disease." Photoelectric plethysmography is "considered useful only in determining whether or not a pulse is present and does not provide reproducible measurements of blood flow." Thus, effective since 1980, NCD 20.14 states that the photoelectric plethysmography used by QuantaFlo is "not covered at this time" by Medicare.

64. UHG's own reimbursement policy was consistent with CMS's position, expressly adopting NCD 20.14 and stating that photoplethysmography is excluded from Medicare coverage.

65. The regulatory reluctance to accept photoplethysmography has support in studies that found the technology unreliable. For example, one clinical evaluation of QuantaFlo found it had a high rate of false positives. One of the relators in the qui tam lawsuit was a consultant to Navix Diagnostix, Inc. During his tenure there, Navix conducted a study in 2016 of 24 individuals who had been diagnosed with PAD using QuantaFlo, but reexamining those patients using ABI showed that only 8 of them actually had PAD. That is, two-thirds of the patients had been inaccurately diagnosed by QuantaFlo.

### D. Defendants Knew That QuantaFlo Did Not Qualify For Reimbursement, Yet Actively Represented To Providers That They Could Be Reimbursed For The Tests

66. According to the DOJ Settlement, PAD screening must be submitted using Current Procedural Terminology ("CPT") codes 93922, 93923, or 93924 to be reimbursable. However, these "codes require that a provider perform an ankle brachial index ('ABI') ***plus*** certain enumerated additional testing." Because QuantaFlo does not use ABI, it does not qualify for reimbursement.

67. According to the DOJ Settlement, "[d]uring the 510k approval process, FDA employees told Semler that QuantaFlo uses photoplethysmography, did not perform an ABI, and could not be called a 'digital ABI.'" Therefore, as of March 2015—years ***before*** the Class Period starts—the Individual Defendants had been informed that QuantaFlow does not qualify for these CPT codes.

68. According to CW 1, Semler knew that QuantaFlo was not specifically approved for any reimbursement code but chose to "piggyback" on other codes. He stated that "it's far less expensive to piggyback" an existing code than it is to conduct clinical trials to get a separate code approved for QuantaFlo. CW 1 recalled that "some of the managers hoped that the company would be acquired before they ever had to be worried about" the reimbursement code, and "then, whoever acquired the company would deal with the mess."

69. According to CW 1, Defendant Murphy-Chutorian "came up with all of our marketing strategies" and was "the brainchild of the revenue recognition model that we had, how we were going to market the device, what kinds of offices we should place the devices at," and how customers made monthly payments rather than buying the device. CW 1 believed that Defendant Murphy-Chutorian "does not suffer any disagreement with his ideas" and "rul[ed] with an iron fist."

70. CW 1 recalled that Defendant Murphy-Chutorian directed all of Semler's marketing and sales strategies, including the practice of telling customers that other providers were using specific codes for reimbursement. CW 1 stated that Defendant Murphy-Chutorian "would direct on the specific language that should be used" to tell customers about the codes that other providers were using for reimbursement. CW 1 corroborates the DOJ Settlement that Semler marketed to physicians that they could get reimbursed using specific codes.

71. Because the Company was fairly small at its early stages, CW 1 attended the weekly Monday meetings at which Defendant Murphy-Chutorian dictated to salespeople the specific language to use about reimbursements. These meetings were attended by all department heads, including the head of marketing, head of sales, and other members of the sales team, as well as people from the customer training division.

72. According to CW 2, the sales team was instructed to tell physicians that they can bill under codes 93922 and 93923. He recalled "going over the codes during training." At times, the training was conducted by Vice President of Strategic Sales Charmayne Domingo, his direct supervisor, or an external training. Though the sales staff provided a qualifying disclaimer that they were "not billers or coders or anything like that," they were told to present the message as: "This is

something you can utilize to help your patients catch PAD in the early stages, and it's more accurate than [traditional ABI], and hey, these are the codes."

73. After the company grew larger and the weekly meetings became senior leadership calls, CW 1 did not attend them, likely in mid-2015. But he knew that Defendant Murphy-Chutorian was still directing salespeople on the language to use about reimbursement "because I used to get emails from customers" asking what codes to use.

74. CW 1's disagreements about the marketing strategy are well-documented in emails to Defendant Murphy-Chutorian sent during the Class Period. CW 1 expressed his belief that Semler needed to invest in its own CPT code and his opposition to the marketing practice of saying what codes other customers were using.

### E. During The Class Period, Semler Reported Remarkable Growth And Presented As Hypothetical The Risk That The Company Could Be Subject To Enforcement Action For FCA Violations

75. During the Class Period, Defendants repeatedly reported that Semler's revenue had grown over the prior period and attributed that growth to its largest customers. For example, during the first quarter 2021 earnings call on May 3, 2021, Rosenberg compared revenue to the prior year period, stating that the quarter's performance reflected "the ability of the large insurance company customers to be proactive in going after the people they need to test through the home testing." He further stated:

> Revenues were higher by 40%, increasing to $13.2 million; pre-tax net income was higher by 74%, increasing to $6 million; net income was higher by 82% increasing to $4.9 million; cash increased to $26.5 million at quarter end. During the quarter, we saw increased orders and usage for our QuantaFlo product from our current insurance company customers and from our health risk assessment customers.

76. During the same first quarter 2021 earnings call, Rosenberg stated that the Company's largest customer had "flexibility in this ability to test [patients] either in the home or with the fixed fee systems." At-home tests would increase variable fee revenue.

77. At the earnings call for fourth quarter and full year 2021 on February 28, 2022, Defendant Weinstein stated:

> In 2021, our largest customers comprised 40.8% and 28.6%, respectively of annual revenues, and 48.6% and 21.7% of fourth quarter revenues. In 2021 compared to 2020, revenues from fixed price software license fee arrangements were

> approximately $30.5 million, an increase of $4.8 million or 19%. Variable-fee software license revenues were approximately $21.5 million, an increase of $9.9 million or 85%. And equipment and other sales were $1 million, a decrease of $300,000 or 24%.

78. By fourth quarter 2022, equipment sales grew significantly, meaning that Semler sold more QuantaFlo devices. During the fourth quarter and full year 2022 earnings call on March 21, 2023, Defendant Weinstein stated:

> In Q4, fixed fee revenues were $9 million, an increase of 14% period-over-period. For the full-year fixed fee revenues were $34 million, an increase of 11% year-over-year. We continue to grow revenues in our largest customer as well as at other existing and new fixed fee customers. We saw increased interest in our products from hospitals, retail locations, and delegated medical groups, which we believe is due at least in part to gaining traction from the two major studies published in 2022.
>
> In Q4, variable fee revenues were $4.5 million, an increase of 30% period-over-period. For the full year, variable fee revenues were $21.3 million, a decrease of 1% year-over-year. In Q3, equipment and other revenues were $300,000, which was an increase of 96% period-over-period. For the full year, equipment and other revenues were $1.4 million, which was an increase of 42% year-over-year. ***Because the majority of equipment sales are to variable fee customers, we believe it is a harbinger of strength in the per test market.***

79. Meanwhile, as further described in Section V.A. *infra*, Defendants claimed in SEC filings that Semler would provide "appropriate resources" to physicians to encourage QuantaFlo usage and provide "***clarity regarding reimbursement and work to obtain appropriate coverage policies***." These statements were materially misleading because they omitted: (1) that Semler represented to physicians that QuantaFlo was reimbursable using certain CPT codes; (2) that QuantaFlo did not qualify for reimbursement under those CPT codes because it did not perform an ABI; (3) that QuantaFlo was not reimbursable because it was considered experimental technology by third-party payors; (4) that, by marketing that QuantaFlo tests were reimbursable, Semler was aiding or facilitating the submission of false claims; (5) that, as a result of the foregoing, there was a risk that Semler would be investigated for FCA violations; and (6) that, as such, there was a material undisclosed risk to Semler's business, operations, and prospects.

80. As further described in Section V.B. *infra*, the SEC filings acknowledged that QuantaFlo is "generally but not specifically approved for any reimbursement code." However, the same filings went on to state that "most of our customers report being covered and reimbursed by third-party payors consistently for procedures using a variety of different reimbursement codes[.]"

This created a misleading impression that QuantaFlo was reimbursable when, in fact, most third-party payors considered QuantaFlo to be experimental and, by marketing that QuantaFlo was reimbursable, Semler was facilitating the submission of false claims that exposed the Company to regulatory scrutiny.

81. All the while, Semler claimed that it was "***possible*** that a review of our business practices" for compliance with "applicable healthcare fraud and abuse laws and regulations" "***could*** result in a determination with an adverse effect on our business." In reality, Semler had been the subject of an undisclosed investigation by the DOJ since 2017 for potential FCA violations.

### F. After CMS Changed Risk Adjustments For PAD, Semler Pivoted Its Business Model To Invest In Bitcoin

82. On March 31, 2023, CMS announced that only PAD diagnoses with complications would result in an increased risk adjustment factor. Specifically, "codes that indicate more serious cases of vascular disease were retained in the payment HCCs, and diagnoses for 'other' and 'unspecified' disease were mapped to a non-payment HCC." This rule change meant that PAD without complications would not increase capitated payments.

83. This change would be phased over a 3-year period, as CMS stated:

> For CY 2024, risk scores will be calculated as the sum of 33% of the risk score calculated using the updated 2024 CMS-HCC risk adjustment model with 67% of the risk score calculated using the current 2020 CMS-HCC risk adjustment model. For 2025, we expect risk scores will be calculated as the sum of 67% of the risk score calculated using updated 2024 CMS-HCC risk adjustment model with 33% of the risk score calculated using the 2020 CMS-HCC risk adjustment model. For 2026, we expect that 100% of the risk scores will be calculated using the updated model.

84. This rule change nullified the financial incentive to increase PAD diagnoses. PAD with complications would require higher healthcare costs, which is why they would result in a higher risk adjustment factor under the announced rule. But PAD *without* complications had been profitable to MAOs because it would result in additional capitated payments without necessarily corresponding with higher healthcare costs. By some estimates, this rule change was projected to reduce the risk adjustment factor for vascular diseases by 79%, leading to a substantial decline in the capitated payments.

85. After this change was public, investors were concerned that it would materially impact Semler. According to a February 7, 2023 note by Lake Street Capital Partners (in response to CMS's February 1, 2023 advance notice, which solicited public comment on the rule), HCC code 108, "which relates to PAD, appears to have been eliminated entirely." As a result, "some worry that the underlying payment related to Semler's QuantaFlo test could be changed or eliminated, and that this could substantially impact SMLR's revenue and earnings." But Lake Street Capital Partners continued in that report to state: "To our knowledge, CMS is not a significant customer. Thus, while a planned change in reimbursement from CMS to a health plan related to PAD testing, certainly ***could*** trigger a change in behavior from the plans, it is too early to predict whether a significant percent of Semler's customers will stop paying for the software." Due to the "serious health issue" of PAD, Lake Street posited that "health insurers will conclude the cost benefit analysis favors performing the tests."

86. Initially, Semler claimed that the rule change would not impact revenue. At the 22nd Annual Needham Conference, newly-appointed CEO Pan assured that there was still an incentive for MAOs to use QuantaFlo because early detection of PAD allowed healthcare providers to implement early interventions, which reduced long-term healthcare costs. He claimed that "our thought has always been that the cost savings aspect of this might in fact be quite a bit larger than the reimbursement ever was."

87. Pan's tenure as CEO was short-lived, as was the suggestion that Semler could maintain its revenue stream without CMS reimbursements for PAD without complications. By the first quarter 2023 earnings call held on May 10, 2023, Semler walked back Pan's statements. Defendant Cormier stated during that call that CMS's "decision ***might*** have an effect on our PAD testing business because many of our customers rely on HCC payments to support PAD testing program for Medicare Advantage patients, which includes asymptomatic patients." She continued that "[t]o date, our customers continue using our products for PAD testing unabated, but it's too early to make any predictions about future customer behavior." During the second quarter 2023 earnings call held on August 10, 2023, Defendant Cormier stated "It's really to early to speculate

on any potential impacts to our customers, but for now, there – we are seeing testing at an increased rate, obviously as you can see from our results."

88. Semler later acknowledged that it could no longer rely on MAOs to drive QuantaFlo usage. For example, during the third quarter 2023 earnings call held on November 9, 2023, Herrington stated that Semler's sales and marketing goals were "to diversify [its] customer base by adding medical centers, additional value-based care providers, penetrating deeper into the VA system and growing the self-insured employer, pharmaceutical and retail market." By the next quarter, Defendant Cormier stated that Semler "do[es] continue to expand [its] market with customers that are not dependent on Medicare Advantage" and "we are looking to expand outside the Medicare Advantage space."

89. The 3-year phase-in period started a clock for Semler to find a new revenue source. To sustain business, Semler changed its prices, as Defendant Cormier stated during the first quarter 2024 earnings call: "While our revenues are not directly linked to the CMS payments to our customers, some of the largest customers were offered additional volume pricing tiers. So we are seeing continued testing, but we also see some cleanup of underutilized units."

90. Then Semler abruptly announced that it would invest in Bitcoin. On May 28, 2024, the Company announced that "its board of directors has adopted bitcoin as its primary treasury reserve asset" and purchased $40 million worth of Bitcoin. In the press release, Semler's chairman of the board Eric Semler claimed that "bitcoin has the potential to generate outsize returns as it gains increasing acceptance as digital gold." Still, Defendant Murphy-Chutorian affirmed that Semler was "focused on maintaining sales of QuantaFlo" and seeking clearance for additional indications.

### G. Semler Reveals That It Had Been Subject To A Years-Long Investigation For FCA Violations And Settled The Claims For About $30 Million

91. On February 18, 2025, Semler held its conference call to discuss fourth quarter and full year 2024 financial results. Defendants Murphy-Chutorian and Cormier participated on the call, along with COO Herrington and Chairman Eric Semler. No one mentioned that Semler had engaged in settlement discussions with the DOJ to resolve potential claims that the Company violated the FCA.

92. On February 28, 2025, after the market closed, Semler revealed for the first time that it had been under investigation since 2017 for FCA violations. Specifically, the Company stated in its fiscal 2024 Form 10-K:

> In July 2017, we received an initial civil investigative demand, or CID, from the DOJ pursuant to the federal False Claims Act investigating whether we and others may have violated the False Claims Act by marketing tests on devices that use photoplethysmography technology as reimbursable by Medicare in alleged contravention of applicable laws and regulations. We cooperated with the investigation, along with subsequent CIDs received in February 2019, December 2021, April 2022 and April 2023 addressed to our company or individual current or former employees related to the same investigation. In September 2024, DOJ shared certain information to which we responded in January and February 2025.

93. The same report continued that Semler had briefly engaged in settlement discussions for these claims, but there was a risk that the Company would face a lawsuit prosecuted by the DOJ:

> On February 6, 2025, DOJ asked if we wished to engage in settlement discussions to resolve any potential claims by February 11, 2025 and if so that we make a settlement offer by such deadline. Prior to February 6, 2025, DOJ had not stated an intention to pursue a claim of wrongdoing against our company. On February 11, 2025, we began initial settlement discussions with DOJ, but ceased initial discussions on that date. Accordingly, there is a risk that DOJ will file a complaint or complaint in intervention in a civil False Claims Act lawsuit seeking damages. We do not believe the amount of loss can be reasonably estimated. We intend to vigorously defend ourselves in any such action.

94. On this news, the Company's stock fell $4.03, or 9.39%, to close at $38.89 on March 3, 2025.

95. On April 15, 2025, after the market closed, Semler revealed that it had settled claims with the DOJ for alleged FCA violations for $29.75 million. Specifically, Semler stated in a Form 8-K:

> As previously reported, in Part I, Item 3 of its annual report on Form 10-K for the year ended December 31, 2024, on February 11, 2025, Semler Sci began initial settlement discussions with DOJ pertaining to a CID, but ceased initial discussions on that date. Semler Sci subsequently resumed settlement discussions with DOJ and has reached agreement in principle on payment of $29.75 million to settle all claims (which amount excludes any potential relator counsel fees that may also be payable). There is no guarantee that Semler Sci will be able to reach final agreement with DOJ or the Department of Health and Human Services, or HHS, which may require Semler Sci to make further undertakings in connection with the proposed settlement. If Semler Sci and DOJ are not able to conclude a final settlement reasonably acceptable to all parties, including reaching any necessary agreements with HHS, there is still a risk that DOJ will file a complaint or complaint in intervention in a civil False Claims Act lawsuit seeking damages in excess of such agreed settlement amount, which potential loss cannot be reasonably estimated. Should the parties not

be able to reach settlement and DOJ file a complaint, Semler Sci intends to vigorously defend itself in any such action.

96. On this news, the Company's stock fell $3.40, or 9.88%, to close at $31.00 per share on April 16, 2025.

97. The DOJ Settlement became public on September 10, 2025. *See* Exhibit A. Therein, the DOJ contended that Semler violated the FCA from 2010 to 2024 "by knowingly causing, and conspiring to cause, the submission of false claims to Medicare Part B for tests performed using the FloChec and QuantaFlo devices." The devices did not satisfy reimbursement codes "because they do not perform an ABI" and because NCD 20.14 "prohibit[s] reimbursement for noninvasive vascular tests that use photoplethysmography because of concerns about accuracy and reproducibility."

98. According to the DOJ Settlement, between 2010 and 2024, "Semler represented to customers that Medicare has reimbursed other customers for tests performed using Flochec and QuantaFlo if they submitted the CPT codes 93922, 93923, and 93924." The Company "made these representations in written reimbursement FAQs; trainings for customers and sales representatives; by email; in calls between Semler employees and customers; and through its distributor, Bard Peripheral Vascular, Inc." Moreover, Semler had "received concerns from Bard, customers, and third-parties" that these tests were not reimbursable because they do not satisfy the relevant codes or CMS determinations.

99. The Company's products were distributed by Bard Peripheral Vascular, Inc. ("Bard"), now a wholly owned subsidiary of Becton, Dickinson and Company, from August 2012 through approximately September 2022. For its part, Bard also settled claims with the DOJ for $7.2 million. *See* Exhibit B ("Bard Settlement"). The Bard Settlement stated that "Semler and Bard discussed whether tests performed using the Devices were reimbursable" and "Semler also provided Bard with certain marketing materials." Bard was required to provide Semler with any promotional materials it created that were "'inconsistent with [Semler's] approved literature and/or labeling,' . . . and Bard was not permitted to 'use any such materials without obtaining [Semler's] prior written consent[.]'" (alterations in original).

100. The DOJ Settlement contains a provision that is typical of settlement agreements, stating that the settlement not "an admission of liability by Semler[.]" That provision does not vindicate Defendants of the securities fraud claims alleged herein. First, the DOJ Settlement substantiates the allegations in the qui tam lawsuit that Semler participated in a scheme with UHG to submit false reimbursement claims. Second, the settlement amount is material: the approximately $30 million settlement is roughly half of the Company's fiscal 2024 revenues ($56.3 million). Third, twelve days after the DOJ Settlement was publicized, Semler announced that it would be acquired by Strive, Inc., the first U.S. publicly traded bitcoin treasury asset management firm, demonstrating that QuantaFlo revenues would be negligible. Fourth, following that acquisition, the "brainchild" of the marketing materials Defendant Murphy-Chutorian no longer had a role at Semler.

101. In connection with the DOJ Settlement, Semler also entered a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the Department of Health and Human Services, in which the Company committed to implement certain governance controls and procedures designed to prevent these FCA violations from reoccurring. *See* Exhibit C. Semler had to appoint a Compliance Officer and form a Compliance Committee to be responsible for oversight of the Company's compliance with the "Federal health care program and FDA requirements." Semler had to engage an independent review organization to conduct a systems review and a transactions review related to the marketing and promotion of QuantaFlo and other products that are reimbursed by federal health care programs. The CIA included a self-reporting requirement of actual and probable violations of the federal health care program or FDA requirements.

102. The Company is subject to the CIA for five years. Semler must annually file reports with the OIG about the efforts to comply with the CIA, such as the descriptions and dates of the meetings convened by the Compliance Committee, reports by the Compliance Officer, changes to the applicable processes. Management must also certify that Semler "is in compliance with applicable Federal health care program and FDA requirements and with the requirements of this CIA."

### H. Unable To Support Medical Sales After CMS's Rule Change And The DOJ Settlement, Semler Is Acquired For Its Bitcoin

103. By fiscal 2025, Semler's revenue fell significantly. For example, second quarter 2025 revenue was $8.2 million. During the related earnings call held in August 2025, Defendant Cormier stated the year-over-year decline was "due to the continued phase-in of the 2024 CMS rate announcement that impacted reimbursement for positive PAD patients, and which is resulting in decreased usage of our device at some of our customers."

104. On September 10, 2025, as part of the same Form 8-K announcing the DOJ Settlement, Semler also revealed that a large customer accounting for 44.9% of revenue had notified the Company that it "expected to significantly reduce use of QuantaFlo devices effective October 1, 2025." As a result, Semler expected fourth quarter 2025 revenue to decline by 50%.

105. As a result of the foregoing, the focus of earnings calls shifted to Semler's Bitcoin strategy. By the end of fiscal 2024, Semler held 2,298 bitcoins that were acquired for an aggregate purchase price of $189.7 million. By contrast, Semler's fiscal 2024 revenues were only $56.3 million.

106. In late 2025, Semler announced that it would be acquired by Strive, Inc. in an all-stock transaction where the implied acquisition price was a 210% premium to the then-trading price of Semler. The deal announcement focused on Semler's Bitcoin strategy and holdings, making clear that QuantaFlo—the technology that had propelled the Company since its founding—was an afterthought. Indeed, for the first quarter 2026, Strive reported only $1.3 million in revenue from medical device sales. Following the acquisition, Defendant Murphy-Chutorian ceased to be an executive or a director of Semler.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. Statements About Reimbursement Codes

107. On March 9, 2021, after the market closed, Semler filed its Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). It was signed by Defendants Murphy-Chutorian and Weinstein. Under Item I. Business of the 2020 10-K, Semler stated:

> Generally speaking, individual products are not specifically approved by name under a third-party payor code. ***Physicians who seek reimbursement for PAD testing procedures are likely to use codes that describe non-invasive physiologic testing of extremities. We do not track directly how physicians code for and receive payment for such procedures.***

108. Item I. Business of the 2020 10-K further claimed that Semler "cannot control" whether providers sought third-party coverage or reimbursement for QuantaFlo usage. Specifically, it stated:

> Third-Party Coverage and Reimbursement
>
> ***We cannot control whether or not providers who use QuantaFlo® will seek third-party coverage for such procedures or reimbursement.*** If providers intend to seek third-party coverage or reimbursement for use of QuantaFlo®, the success of our product could become dependent on the availability of coverage and reimbursement from third-party payors, such as governmental programs including Medicare and Medicaid, private insurance plans and managed care programs. Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payors and adequate payment for the resources used.
>
> Physician coding for procedures is established by the American Medical Association. CMS, the agency responsible for administering Medicare and Medicaid, and the National Center for Health Statistics, are jointly responsible for overseeing changes and modifications to billing codes used by hospitals for reporting inpatient procedures, and many private payors use coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies. All physician and hospital coding is subject to change, which could impact coverage and reimbursement and physician practice behavior. We do not track denial of requests for reimbursement made by the users of QuantaFlo®. It is our belief that such denials have occurred and might occur in the future with more or less frequency. We are not in the business of performing QuantaFlo® measurements that require us to seek reimbursement from third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, commercial health insurers, including those that offer Medicare Advantage plans, and managed care programs. Many of our customers are third-party payors who pay us directly for use of our product and services.
>
> ***Independent of the coding status, third-party payors may deny coverage based on their own criteria, such as if they believe that the clinical efficacy of a device or procedure is not well established and is deemed experimental or investigational***, is not the most cost-effective treatment available, or is used for an unapproved indication. ***We will continue to provide the appropriate resources to patients, physicians, hospitals and insurers in order to promote the best in patient care and clarity regarding reimbursement and work to obtain appropriate coverage policies.*** For some governmental programs, such as Medicaid, coverage and reimbursement differ from state to state, and some state Medicaid programs may not pay an adequate amount for the procedures performed with our products, if any payment is made at all. As the portion of the U.S. population over the age of 65 and eligible for Medicaid continues to grow, we may be more vulnerable to coverage and reimbursement limitations imposed by CMS. National and regional coverage policy decisions are subject to unforeseeable change and have the potential to impact physician behavior. For example, if CMS decreases the monthly payment for a 65-year-old patient, then

> the provider will have to decide which steps to eliminate from his or her routine office visits in order to maintain a profitable business model. If the time of an office visit will need to be reduced to maintain a profitable business, a provider may decide to eliminate certain services or conducting certain procedures, such as deciding not to use a thermometer, take someone's blood pressure or use a QuantaFlo® to run an ABI test. Thus, reimbursement limitations imposed by CMS on providers may affect their decision making about which services to provide during an office visit, which could affect our company.
>
> Particularly in the United States, third-party payors carefully review, have undertaken cost-containment initiatives, and increasingly challenge, the prices charged for procedures and medical products as well as any technology that they, in their own judgment, consider experimental or investigational. In addition, an increasing percentage of insured individuals are receiving their medical care through managed care programs, which monitor and often require pre-approval or pre-authorization of the services that a member will receive. Many managed care programs are paying their providers on a capitated basis, which puts the providers at financial risk for the services provided to their patients by paying them a predetermined amount per member per month. The percentage of individuals covered by managed care programs is expected to grow in the United States over the next decade.
>
> There can be no assurance that third-party coverage and reimbursement will be available or adequate, or that future legislation, regulation, or coverage and reimbursement policies of third-party payors will not adversely affect the demand for our products or our ability to sell these products on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

109. On March 4, 2022, Semler filed its Form 10-K for the year ended December 31, 2021 (the "2021 10-K"). It was signed by Defendants Murphy-Chutorian and Weinstein. Under Item I. Business of the 2021 10-K, Semler stated:

> Generally speaking, individual products are not specifically approved by name under a third-party payor code. ***Physicians who seek reimbursement for PAD testing procedures are likely to use codes that describe non-invasive physiologic testing. We do not track directly how physicians code for and receive payment for such procedures.***

110. Under Item I. Business of the 2021 10-K, Semler stated:

> Third-Party Coverage and Reimbursement
>
> ***We cannot control whether or not providers who use QuantaFlo will seek third-party coverage for such procedures or reimbursement.*** If providers intend to seek third-party coverage or reimbursement for use of QuantaFlo, the success of our product could become dependent on the availability of coverage and reimbursement from third-party payors, such as governmental programs including Medicare and Medicaid, private insurance plans and managed care programs. Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payors and adequate payment for the resources used.

Physician coding for procedures is established by the American Medical Association. CMS, the agency responsible for administering Medicare and Medicaid, and the National Center for Health Statistics, are jointly responsible for overseeing changes and modifications to billing codes used by hospitals for reporting inpatient procedures, and many private payors use coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies. All physician and hospital coding is subject to change, which could impact coverage and reimbursement and physician practice behavior. We do not track denial of requests for reimbursement made by the users of QuantaFlo. It is our belief that such denials have occurred and might occur in the future with more or less frequency. We are not in the business of performing QuantaFlo measurements that require us to seek reimbursement from third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, commercial health insurers, including those that offer Medicare Advantage plans, and managed care programs. Many of our customers are third-party payors who pay us directly for use of our product and services.

***Independent of the coding status, third-party payors may deny coverage based on their own criteria, such as if they believe that the clinical efficacy of a device or procedure is not well established and is deemed experimental or investigational***, is not the most cost-effective treatment available, or is used for an unapproved indication. ***We will continue to provide the appropriate resources to patients, physicians, hospitals and insurers in order to promote the best in patient care and clarity regarding reimbursement and work to obtain appropriate coverage policies.*** For some governmental programs, such as Medicaid, coverage and reimbursement differ from state to state, and some state Medicaid programs may not pay an adequate amount for the procedures performed with our products, if any payment is made at all. As the portion of the U.S. population over the age of 65 and eligible for Medicaid continues to grow, we may be more vulnerable to coverage and reimbursement limitations imposed by CMS. National and regional coverage policy decisions are subject to unforeseeable change and have the potential to impact physician behavior. For example, if CMS decreases the monthly payment for a 65-year-old patient, then the provider will have to decide which steps to eliminate from his or her routine office visits in order to maintain a profitable business model. If the time of an office visit will need to be reduced to maintain a profitable business, a provider may decide to eliminate certain services or conducting certain procedures, such as deciding not to use a thermometer, take someone’s blood pressure or use a QuantaFlo to run an ABI test. Thus, reimbursement limitations imposed by CMS on providers may affect their decision making about which services to provide during an office visit, which could affect our company.

Particularly in the United States, third-party payors carefully review, have undertaken cost-containment initiatives, and increasingly challenge, the prices charged for procedures and medical products as well as any technology that they, in their own judgment, consider experimental or investigational. In addition, an increasing percentage of insured individuals are receiving their medical care through managed care programs, which monitor and often require pre-approval or pre-authorization of the services that a member will receive. Many managed care programs are paying their providers on a capitated basis, which puts the providers at financial risk for the services provided to their patients by paying them a predetermined amount per member per month. The percentage of individuals covered by managed care programs is expected to grow in the United States over the next decade.

> There can be no assurance that third-party coverage and reimbursement will be available or adequate, or that future legislation, regulation, or coverage and reimbursement policies of third-party payors will not adversely affect the demand for our products or our ability to sell these products on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

111. On March 23, 2023, Semler filed its Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). It was signed by Defendants Murphy-Chutorian and Weinstein. Under Item I. Business of the 2022 10-K, Semler stated:

> Generally speaking, individual products are not specifically approved by name under a third-party payor code. ***Physicians who seek reimbursement for testing procedures are likely to use codes that describe non-invasive physiologic testing. We do not track directly how physicians code for and receive payment for such procedures.***

112. Under Item I. Business of the 2022 10-K, Semler stated:

> Third-Party Coverage and Reimbursement
>
> ***We cannot control whether or not providers who use QuantaFlo will seek third-party coverage for such procedures or reimbursement.*** If providers intend to seek third-party coverage or reimbursement for use of QuantaFlo, the success of our product could become dependent on the availability of coverage and reimbursement from third-party payors, such as governmental programs including Medicare and Medicaid, private insurance plans and managed care programs. Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payors and adequate payment for the resources used.
>
> Physician coding for procedures is established by the American Medical Association. CMS, the agency responsible for administering Medicare and Medicaid, and the National Center for Health Statistics, are jointly responsible for overseeing changes and modifications to billing codes used by hospitals for reporting inpatient procedures, and many private payors use coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies. All physician and hospital coding is subject to change, which could impact coverage and reimbursement and physician practice behavior. We do not track denial of requests for reimbursement made by the users of QuantaFlo. It is our belief that such denials have occurred and might occur in the future with more or less frequency. We are not in the business of performing QuantaFlo measurements that require us to seek reimbursement from third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, commercial health insurers, including those that offer Medicare Advantage plans, and managed care programs. Many of our customers are third-party payors who pay us directly for use of our product and services.
>
> ***Independent of the coding status, third-party payors may deny coverage based on their own criteria, such as if they believe that the clinical efficacy of a device or procedure is not well established and is deemed experimental or investigational***, is not the most cost-effective treatment available, or is used for an unapproved indication. ***We will continue to provide the appropriate resources to patients,***

> ***physicians, hospitals and insurers in order to promote the best in patient care and clarity regarding reimbursement and work to obtain appropriate coverage policies.*** For some governmental programs, such as Medicaid, coverage and reimbursement differ from state to state, and some state Medicaid programs may not pay an adequate amount for the procedures performed with our products, if any payment is made at all. As the portion of the U.S. population over the age of 65 and eligible for Medicaid continues to grow, we may be more vulnerable to coverage and reimbursement limitations imposed by CMS. National and regional coverage policy decisions are subject to unforeseeable change and have the potential to impact physician behavior. For example, if CMS decreases the monthly payment for a 65-year-old patient, then the provider will have to decide which steps to eliminate from his or her routine office visits in order to maintain a profitable business model. If the time of an office visit will need to be reduced to maintain a profitable business, a provider may decide to eliminate certain services or conducting certain procedures, such as deciding not to use a thermometer, take someone's blood pressure or use a QuantaFlo to run an ABI test. Thus, reimbursement limitations imposed by CMS on providers may affect their decision making about which services to provide during an office visit, which could affect our company.
>
> Particularly in the United States, third-party payors carefully review, have undertaken cost-containment initiatives, and increasingly challenge, the prices charged for procedures and medical products as well as any technology that they, in their own judgment, consider experimental or investigational. In addition, an increasing percentage of insured individuals are receiving their medical care through managed care programs, which monitor and often require pre-approval or pre-authorization of the services that a member will receive. Many managed care programs are paying their providers on a capitated basis, which puts the providers at financial risk for the services provided to their patients by paying them a predetermined amount per member per month. The percentage of individuals covered by managed care programs is expected to grow in the United States over the next decade.
>
> There can be no assurance that third-party coverage and reimbursement will be available or adequate, or that future legislation, regulation, or coverage and reimbursement policies of third-party payors will not adversely affect the demand for our products or our ability to sell these products on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

113. On March 7, 2024, Semler filed its Form 10-K for the year ended December 31, 2023 (the "2023 10-K"). It was signed by Defendants Murphy-Chutorian and Cormier. Under Item I. Business of the 2023 10-K, Semler stated:

> Generally speaking, individual products are not specifically approved by name under a third-party payor code. ***Physicians who seek reimbursement for testing procedures are likely to use codes that describe non-invasive physiologic testing. We do not track directly how physicians code for and receive payment for such procedures.***

114. Under Item I. Business of the 2023 10-K, Semler stated:

> ***Third-Party Coverage and Reimbursement***

***We cannot control whether or not providers who use QuantaFlo will seek third-party coverage for such procedures or reimbursement.*** If providers intend to seek third-party coverage or reimbursement for use of QuantaFlo, the success of our product could become dependent on the availability of coverage and reimbursement from third-party payors, such as governmental programs including Medicare and Medicaid, private insurance plans and managed care programs. Reimbursement is contingent on established coding for a given procedure, coverage of the codes by the third-party payors and adequate payment for the resources used.

Physician coding for procedures is established by the American Medical Association. CMS, the agency responsible for administering Medicare and Medicaid, and the National Center for Health Statistics, are jointly responsible for overseeing changes and modifications to billing codes used by hospitals for reporting inpatient procedures, and many private payors use coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies. All physician and hospital coding is subject to change, which could impact coverage and reimbursement and physician practice behavior. We do not track denial of requests for reimbursement made by the users of QuantaFlo. It is our belief that such denials have occurred and might occur in the future with more or less frequency. We are not in the business of performing QuantaFlo measurements that require us to seek reimbursement from third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, commercial health insurers, including those that offer Medicare Advantage plans, and managed care programs. Many of our customers are third-party payors who pay us directly for use of our product and services.

***Independent of the coding status, third-party payors may deny coverage based on their own criteria, such as if they believe that the clinical efficacy of a device or procedure is not well established and is deemed experimental or investigational***, is not the most cost-effective treatment available, or is used for an unapproved indication. ***We will continue to provide the appropriate resources to patients, physicians, hospitals and insurers in order to promote the best in patient care and clarity regarding reimbursement and work to obtain appropriate coverage policies.*** For some governmental programs, such as Medicaid, coverage and reimbursement differ from state to state, and some state Medicaid programs may not pay an adequate amount for the procedures performed with our products, if any payment is made at all. As the portion of the U.S. population over the age of 65 and eligible for Medicaid continues to grow, we may be more vulnerable to coverage and reimbursement limitations imposed by CMS. National and regional coverage policy decisions are subject to unforeseeable change and have the potential to impact physician behavior. For example, if CMS decreases the monthly payment for a 65-year-old patient, then the provider will have to decide which steps to eliminate from his or her routine office visits in order to maintain a profitable business model. If the time of an office visit will need to be reduced to maintain a profitable business, a provider may decide to eliminate certain services or conducting certain procedures, such as deciding not to use a thermometer, take someone's blood pressure or use a QuantaFlo to run an ABI test. Thus, reimbursement limitations imposed by CMS on providers may affect their decision making about which services to provide during an office visit, which could affect our company.

Particularly in the United States, third-party payors carefully review, have undertaken cost-containment initiatives, and increasingly challenge, the prices charged for procedures and medical products as well as any technology that they, in their own judgment, consider experimental or investigational. In addition, an increasing percentage of insured individuals are receiving their medical care through

managed care programs, which monitor and often require pre-approval or pre-authorization of the services that a member will receive. Many managed care programs are paying their providers on a capitated basis, which puts the providers at financial risk for the services provided to their patients by paying them a predetermined amount per member per month. The percentage of individuals covered by managed care programs is expected to grow in the United States over the next decade.

There can be no assurance that third-party coverage and reimbursement will be available or adequate, or that future legislation, regulation, or coverage and reimbursement policies of third-party payors will not adversely affect the demand for our products or our ability to sell these products on a profitable basis. The unavailability or inadequacy of third-party payor coverage or reimbursement could have a material adverse effect on our business, operating results and financial condition.

115. The statements in ¶¶107-114 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Semler represented to physicians that QuantaFlo was reimbursable using certain CPT codes; (2) that QuantaFlo did not qualify for reimbursement under those CPT codes because it did not perform an ABI; (3) that QuantaFlo was not reimbursable because it was considered experimental technology by third-party payors; (4) that, by marketing that QuantaFlo tests were reimbursable, Semler was aiding or facilitating the submission of false claims; (5) that, as a result of the foregoing, there was a risk that Semler would be investigated for FCA violations; and (6) that, as such, there was a material undisclosed risk to Semler's business, operations, and prospects.

## B. Risks About Medicare Reimbursement and FCA Violations

116. Under Risk Factors, the 2020 10-K stated:

***Our vascular testing product is generally but not specifically approved for reimbursement under any third-party payor codes; if third-party payors refuse to reimburse our customers for their use of our product, it could have a material adverse effect on our business.***

Our vascular testing product is licensed by healthcare providers. They may bill various third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, private insurance plans and managed care programs for procedures in which our vascular testing product is used. Reimbursement is a significant factor considered by healthcare providers in determining whether to license medical devices or systems such as our vascular testing product. We cannot control whether or not providers who use our vascular testing product will seek reimbursement. Therefore, our ability to successfully commercialize our vascular testing product could depend on the coverage and adequacy of reimbursement from these third-party payors.

***Currently, our vascular testing product is generally but not specifically approved for any particular reimbursement code. Although most of our customers report being covered and reimbursed by third-party payors consistently for procedures using a variety of different reimbursement codes, there is a risk that third-party payors may disagree with the reimbursement under a particular code.*** In addition, some potential customers have deferred renting our product given the uncertainty regarding reimbursement. We do not track denial of requests for reimbursement made by the users of our product. It is our belief that such denials have occurred and might occur in the future with more or less frequency. Even if our product and procedures are often currently covered and reimbursed by third-party payors and Medicare, problems for customers to receive reimbursement or adverse changes in payors' coverage and reimbursement policies that affect our product could harm our ability to market our vascular testing product. Obtaining approval for a particular reimbursement code is time consuming and can be costly. Accordingly, at this time, and given the way we intend our vascular testing product to be used, we do not intend to pursue formal approval for our vascular testing product for any particular code.

Moreover, we are unable to predict what changes will be made to the reimbursement methodologies used by third-party payors. We cannot be certain that under current and future payment systems, in which healthcare providers may be reimbursed a set amount based on the type of procedure performed, such as those utilized by Medicare and in many privately managed care systems, the cost of our product will be justified and incorporated into the overall cost of the procedure.

117. Under Risk Factors, the 2020 10-K stated:

***The applicable healthcare fraud and abuse laws and regulations, along with the increased enforcement environment, may lead to an enforcement action targeting us, which could adversely affect our business.***

We are subject to various healthcare fraud and abuse laws and regulations, as described "Business—Government Regulation—Healthcare Fraud and Abuse." We may be subject to liability under such laws and may also be subject to liability for any future conduct that is deemed by the government or the courts to violate these laws, including significant administrative, criminal and civil penalties, damages, fines, disgorgement, imprisonment, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid, additional reporting obligations and oversight if subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, contractual damages, reputational harm, diminished profits and future earnings, and curtailment or restructuring of operations.

Additionally, the government has continued to pursue an increasing number of enforcement actions. This increased enforcement environment may increase scrutiny of us, directly or indirectly, and could increase the likelihood of an enforcement action targeting us. We have entered into a supply and distribution agreement with Bard. These customers include parties that bill Federal healthcare programs for use of our product, all of whom may be subject to government scrutiny. Finally, to the extent that any of the agreements are breached or terminated, our business may experience a decrease in revenues. In addition, to the extent that our customers, many of whom are providers, may be affected by this increased enforcement environment, our business could correspondingly be affected. ***It is possible that a review of our business practices or those of our customers by courts or government authorities could result in a determination with an adverse effect on our business.*** We cannot predict the effect of possible future enforcement actions on our business.

118. The foregoing risks in ¶¶116-117 were incorporated by reference into the quarterly reports for first quarter 2021 (filed on May 7, 2021), second quarter 2021 (filed on August 6, 2021), and third quarter 2021 (filed on November 5, 2021). Each of these reports was signed by Defendants Murphy-Chutorian and Weinstein.

119. Under Risk Factors, the 2021 10-K stated:

> ***Our vascular testing product is generally but not specifically approved for reimbursement under any third-party payor codes; if third-party payors refuse to reimburse our customers for their use of our product, it could have a material adverse effect on our business.***
>
> Our vascular testing product is licensed by healthcare providers. They may bill various third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, private insurance plans and managed care programs for procedures in which our vascular testing product is used. Reimbursement is a significant factor considered by healthcare providers in determining whether to license medical devices or systems such as our vascular testing product. We cannot control whether or not providers who use our vascular testing product will seek reimbursement. Therefore, our ability to successfully commercialize our vascular testing product could depend on the coverage and adequacy of reimbursement from these third-party payors.
>
> ***Currently, our vascular testing product is generally but not specifically approved for any particular reimbursement code. Although most of our customers report being covered and reimbursed by third-party payors consistently for procedures using a variety of different reimbursement codes, there is a risk that third-party payors may disagree with the reimbursement under a particular code.*** In addition, some potential customers have deferred renting our product given the uncertainty regarding reimbursement. We do not track denial of requests for reimbursement made by the users of our product. It is our belief that such denials have occurred and might occur in the future with more or less frequency. Even if our product and procedures are often currently covered and reimbursed by third-party payors and Medicare, problems for customers to receive reimbursement or adverse changes in payors' coverage and reimbursement policies that affect our product could harm our ability to market our vascular testing product. Obtaining approval for a particular reimbursement code is time consuming and can be costly. Accordingly, at this time, and given the way we intend our vascular testing product to be used, we do not intend to pursue formal approval for our vascular testing product for any particular code.
>
> Moreover, we are unable to predict what changes will be made to the reimbursement methodologies used by third-party payors. We cannot be certain that under current and future payment systems, in which healthcare providers may be reimbursed a set amount based on the type of procedure performed, such as those utilized by Medicare and in many privately managed care systems, the cost of our product will be justified and incorporated into the overall cost of the procedure.

120. Under Risk Factors, the 2021 10-K stated:

> ***The applicable healthcare fraud and abuse laws and regulations, along with the increased enforcement environment, may lead to an enforcement action targeting us, which could adversely affect our business.***

> We are subject to various healthcare fraud and abuse laws and regulations, as described "Business—Government Regulation—Healthcare Fraud and Abuse." We may be subject to liability under such laws and may also be subject to liability for any future conduct that is deemed by the government or the courts to violate these laws, including significant administrative, criminal and civil penalties, damages, fines, disgorgement, imprisonment, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid, additional reporting obligations and oversight if subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, contractual damages, reputational harm, diminished profits and future earnings, and curtailment or restructuring of operations.
>
> Additionally, the government has continued to pursue an increasing number of enforcement actions. This increased enforcement environment may increase scrutiny of us, directly or indirectly, and could increase the likelihood of an enforcement action targeting us. We have entered into a supply and distribution agreement with Bard. These customers include parties that bill Federal healthcare programs for use of our product, all of whom may be subject to government scrutiny. Finally, to the extent that any of the agreements are breached or terminated, our business may experience a decrease in revenues. In addition, to the extent that our customers, many of whom are providers, may be affected by this increased enforcement environment, our business could correspondingly be affected. ***It is possible that a review of our business practices or those of our customers by courts or government authorities could result in a determination with an adverse effect on our business.*** We cannot predict the effect of possible future enforcement actions on our business.

121. The foregoing risks in ¶¶119-120 were incorporated by reference into the quarterly reports for first quarter 2022 (filed on May 6, 2022), second quarter 2022 (filed on August 5, 2022), and third quarter 2022 (filed on November 4, 2022). Each of these reports was signed by Defendants Murphy-Chutorian and Weinstein.

122. Under Risk Factors, the 2022 10-K stated:

> ***Our cardiac and vascular testing product is generally but not specifically approved for reimbursement under any third-party payor codes; if third-party payors refuse to reimburse our customers for their use of our product, it could have a material adverse effect on our business.***
>
> Our cardiac and vascular testing product is licensed by healthcare providers. They may bill various third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, private insurance plans and managed care programs for procedures in which our testing product is used. Reimbursement is a significant factor considered by healthcare providers in determining whether to license medical devices or systems such as our cardiac and vascular testing product. We cannot control whether or not providers who use our cardiac and vascular testing product will seek reimbursement. Therefore, our ability to successfully commercialize our cardiac and vascular testing product could depend on the coverage and adequacy of reimbursement from these third-party payors.
>
> Currently, our cardiac and vascular testing product is generally but not specifically approved for any particular reimbursement code. ***Although most of our customers report being covered and reimbursed by third-party payors consistently for***

***procedures using a variety of different reimbursement codes, there is a risk that third-party payors may disagree with the reimbursement under a particular code. In addition, some potential customers have deferred renting our product given the uncertainty regarding reimbursement.*** We do not track denial of requests for reimbursement made by the users of our product. It is our belief that such denials have occurred and might occur in the future with more or less frequency. Even if our product and procedures are often currently covered and reimbursed by third-party payors and Medicare, problems for customers to receive reimbursement or adverse changes in payors' coverage and reimbursement policies that affect our product could harm our ability to market our vascular testing product. Obtaining approval for a particular reimbursement code is time consuming and can be costly. Accordingly, at this time, and given the way we intend our cardiac and vascular testing product to be used, we do not intend to pursue formal approval for our cardiac and vascular testing product for any particular code.

Moreover, we are unable to predict what changes will be made to the reimbursement methodologies used by third-party payors. We cannot be certain that under current and future payment systems, in which healthcare providers may be reimbursed a set amount based on the type of procedure performed, such as those utilized by Medicare and in many privately managed care systems, the cost of our product will be justified and incorporated into the overall cost of the procedure.

123. Under Risk Factors, the 2022 10-K also stated:

***The applicable healthcare fraud and abuse laws and regulations, along with the increased enforcement environment, may lead to an enforcement action targeting us, which could adversely affect our business.***

We are subject to various healthcare fraud and abuse laws and regulations, as described "Business—Government Regulation—Healthcare Fraud and Abuse." We may be subject to liability under such laws and may also be subject to liability for any future conduct that is deemed by the government or the courts to violate these laws, including significant administrative, criminal and civil penalties, damages, fines, disgorgement, imprisonment, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid, additional reporting obligations and oversight if subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, contractual damages, reputational harm, diminished profits and future earnings, and curtailment or restructuring of operations.

Additionally, the government has continued to pursue an increasing number of enforcement actions. This increased enforcement environment may increase scrutiny of us, directly or indirectly, and could increase the likelihood of an enforcement action targeting us. These customers include parties that bill Federal healthcare programs for use of our product, all of whom may be subject to government scrutiny. Finally, to the extent that any of the agreements are breached or terminated, our business may experience a decrease in revenues. In addition, to the extent that our customers, many of whom are providers, may be affected by this increased enforcement environment, our business could correspondingly be affected. ***It is possible that a review of our business practices or those of our customers by courts or government authorities could result in a determination with an adverse effect on our business.*** We cannot predict the effect of possible future enforcement actions on our business.

124. The foregoing risks in ¶¶122-123 were incorporated by reference into the quarterly reports for first quarter 2023 (filed on May 12, 2023), second quarter 2023 (filed on August 14, 2023), and third quarter 2023 (filed on November 13, 2023). The first quarter 2023 report was signed by Defendants Murphy-Chutorian and Weinstein, and the second and third quarter 2023 reports were signed by Defendants Murphy-Chutorian and Cormier.

125. Under Risk Factors, the 2023 10-K also stated:

> ***QuantaFlo is generally but not specifically approved for reimbursement under any third-party payor codes; if third-party payors refuse to reimburse our customers for their use of our product, it could have a material adverse effect on our business.***
>
> QuantaFlo is licensed by healthcare providers. They may bill various third-party payors, including governmental healthcare programs, such as Medicare and Medicaid, private insurance plans and managed care programs for procedures in which our testing product is used. Reimbursement is a significant factor considered by healthcare providers in determining whether to license medical devices or systems such as QuantaFlo. We cannot control whether or not providers who use QuantaFlo will seek reimbursement. Therefore, our ability to successfully commercialize our vascular testing product could depend on the coverage and adequacy of reimbursement from these third-party payors.
>
> ***Currently, our QuantaFlo is generally but not specifically approved for any particular reimbursement code. Although most of our customers report being covered and reimbursed by third-party payors consistently for procedures using a variety of different reimbursement codes, there is a risk that third-party payors may disagree with the reimbursement under a particular code.*** In addition, some potential customers have deferred renting our product given the uncertainty regarding reimbursement. We do not track denial of requests for reimbursement made by the users of our product. It is our belief that such denials have occurred and might occur in the future with more or less frequency. Even if our product and procedures are often currently covered and reimbursed by third-party payors and Medicare, problems for customers to receive reimbursement or adverse changes in payors' coverage and reimbursement policies that affect our product could harm our ability to market our vascular testing product. Obtaining approval for a particular reimbursement code is time consuming and can be costly. Accordingly, at this time, and given the way we intend our QuantaFlo to be used, we do not intend to pursue formal approval for QuantaFlo for any particular code.
>
> Moreover, we are unable to predict what changes will be made to the reimbursement methodologies used by third-party payors. We cannot be certain that under current and future payment systems, in which healthcare providers may be reimbursed a set amount based on the type of procedure performed, such as those utilized by Medicare and in many privately managed care systems, the cost of our product will be justified and incorporated into the overall cost of the procedure.

126. Under Risk Factors, the 2023 10-K also stated:

> ***The applicable healthcare fraud and abuse laws and regulations, along with the increased enforcement environment, may lead to an enforcement action targeting us, which could adversely affect our business.***

> We are subject to various healthcare fraud and abuse laws and regulations, as described "Business—Government Regulation—Healthcare Fraud and Abuse." We may be subject to liability under such laws and may also be subject to liability for any future conduct that is deemed by the government or the courts to violate these laws, including significant administrative, criminal and civil penalties, damages, fines, disgorgement, imprisonment, exclusion from participation as a supplier of product to beneficiaries covered by Medicare or Medicaid, additional reporting obligations and oversight if subject to a corporate integrity agreement or other agreement to resolve allegations of non-compliance with these laws, contractual damages, reputational harm, diminished profits and future earnings, and curtailment or restructuring of operations.
>
> Additionally, the government has continued to pursue an increasing number of enforcement actions. This increased enforcement environment may increase scrutiny of us, directly or indirectly, and could increase the likelihood of an enforcement action targeting us. These customers include parties that bill Federal healthcare programs for use of our product, all of whom may be subject to government scrutiny. Finally, to the extent that any of the agreements are breached or terminated, our business may experience a decrease in revenues. In addition, to the extent that our customers, many of whom are providers, may be affected by this increased enforcement environment, our business could correspondingly be affected***. It is possible that a review of our business practices or those of our customers by courts or government authorities could result in a determination with an adverse effect on our business.*** We cannot predict the effect of possible future enforcement actions on our business.

127. The foregoing risks in ¶¶125-126 were incorporated by reference into the quarterly reports for first quarter 2024 (filed on May 8, 2024). They were stated in substantially the same words in the quarterly reports for second quarter 2024 (filed on August 6, 2023),and third quarter 2024 (filed on November 5, 2024). Each of these reports was signed by Defendants Murphy-Chutorian and Cormier.

128. The statements in ¶¶116-127 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Semler represented to physicians that QuantaFlo was reimbursable using certain CPT codes; (2) that QuantaFlo did not qualify for reimbursement under those CPT codes because it did not perform an ABI; (3) that QuantaFlo was not reimbursable because it was considered experimental technology by third-party payors; and (4) that, as a result of the foregoing, Semler had been the subject of a DOJ investigation for FCA violations since 2017.

**C. Semler Never Disclosed That It Was Subject To A DOJ Investigation For FCA Violations**

129. The 2020 10-K stated:

> **ITEM 3. LEGAL PROCEEDINGS**
>
> From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition.

130. The quarterly reports for first quarter 2021, second quarter 2021, and third quarter 2021 all stated:

> **Item 1. Legal Proceedings.**
>
> None.

131. The 2021 10-K stated:

> **ITEM 3. LEGAL PROCEEDINGS**
>
> From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition.

132. The quarterly reports for first quarter 2022, second quarter 2022, and third quarter 2022 all stated:

> **Item 1. Legal Proceedings.**
>
> None.

133. The 2022 10-K stated:

> **ITEM 3. LEGAL PROCEEDINGS**
>
> From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition.

134. The quarterly reports for first quarter 2023, second quarter 2023, and third quarter 2023 all stated:

> **Item 1. Legal Proceedings.**

None.

135. The 2023 10-K stated:

**ITEM 3. LEGAL PROCEEDINGS**

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any litigation the outcome of which, if determined adversely to us, would individually or in the aggregate be reasonably expected to have a material adverse effect on our business, operating results, cash flows or financial condition.

136. The quarterly reports for first quarter 2024, second quarter 2024, and third quarter 2024 all stated:

**Item 1. Legal Proceedings.**

None.

137. The statements in ¶¶129-136 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that Semler had been the subject of a DOJ investigation for potential FCA violations since 2017; and (2) that the DOJ investigation could materially impact the Company's results and business.

## VI. LOSS CAUSATION

138. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Semler's stock price throughout the Class Period until the truth was disclosed regarding Semler's marketing of QuantaFlo and Semler's noncompliance with the FCA.

139. On February 28, 2025, after the market closed, Semler revealed for the first time that it had been under investigation since 2017 for FCA violations. The same report continued that Semler had briefly engaged in settlement discussions for these claims but there was a risk that the Company would face a lawsuit prosecuted by the DOJ. On this news, the Company's stock fell $4.03, or 9.39%, to close at $38.89 on March 3, 2025.

140. On April 15, 2025, after the market closed, Semler revealed that it had settled claims with the DOJ for alleged FCA violations for $29.75 million. On this news, the Company's stock fell $3.40, or 9.88%, to close at $31.00 per share on April 16, 2025.

141. During the Class Period, Plaintiffs and the Class purchased Semler's common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

142. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Semler, their control over, and/or receipt and/or modification of Semler's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Semler, participated in the fraudulent scheme alleged herein.

143. Because sales of QuantaFlo were the almost exclusive revenue source for the Company, its sales were the core operation of the Company. As such, the Individual Defendants were aware that Semler was improperly marketing QuantaFlo as eligible for Medicare Advantage reimbursement, or they were severely reckless in not knowing it. Their own statements demonstrate that the Individual Defendants were aware of Semler's strategy to target HCC codes to entice MAOs to use QuantaFlo. *See* ¶56. Thus, they knew (or recklessly failed to inform themselves) about how Semler executed that sales strategy, which was by telling customers that other providers had been reimbursed using certain CPT codes. They had reason to know this was improper, especially after the DOJ began investigating Semler for potential FCA violations. That investigation spanned

several years and concerned the business model that generated substantially all of Semler's revenue. Indeed, the magnitude of the DOJ Settlement was about half of Semler's annual revenue, and once Semler could not employ these marketing tactics, its revenue fell to about $1 million per quarter. In such circumstances, it would be absurd to suggest that the Individual Defendants did not know that Semler was improperly claiming QuantaFlo was eligible for reimbursement.

144. The Individual Defendants also had requisite scienter that QuantaFlo could not be called an ABI to justify for reimbursement. According to the DOJ Settlement, "[d]uring the 510k approval process, FDA employees told Semler that QuantaFlo uses photoplethysmography, did not perform an ABI, and could not be called a 'digital ABI.'" The 510(k) clearance for QuantaFlo was headed by then-COO Bob McRae, a C-suite executive, so it is reasonable to infer that management-level employees were aware of the same and that QuantaFlo did not qualify for Medicare reimbursement. This inference is especially probable as to Defendant Murphy-Chutorian, who was an executive at Semler when QuantaFlo received 510(k) clearance. Therefore, the Individual Defendants knew, or were reckless in not knowing, that QuantaFlo (the Company's primary source of revenue) did not qualify for reimbursement under any code for PAD testing.

145. The DOJ Settlement states that Semler made false representations about the reimbursements "in written reimbursement FAQs; trainings for customers and false representatives; by email; in calls between Semler employees and customers; and through its distributor," Bard. According to the Bard Settlement, Semler directed Bard to promote QuantaFlo as reimbursable under CPT codes to CMS. Specifically, the Bard Settlement states that "Semler and Bard discussed whether tests performed using the Devices were reimbursable under certain CPT codes" and "[b]ased on Semler's representations, Bard told its customers that CPT codes 93922, 93923, and/or 93924 may be applicable to tests performed using the Devices when considering reimbursement." These representations to customers were at Semler's express direction, as the Bard Settlement also states that "any promotional materials created by Bard that were 'inconsistent with [Semler's] approved literature and/or labeling,' were required to be permitted to Semler, and Bard was not permitted to use any such materials without obtaining [Semler's] prior written consent[.]"

(alterations in original). As further described in Section IV.D. *supra*, the representations made in Semler's marketing materials were at the express direction of Defendant Murphy-Chutorian.

146. The Individual Defendants' statements in SEC filings that they "do not track directly how physicians code" and "cannot control whether providers seek reimbursement" stand in stark contrast to Defendant Murphy-Chutorian's substantial involvement in the marketing strategy and the widespread nature of the false representations to customers through multiple channels. This dissonance implies either that the Individual Defendants had actual knowledge that Semler was misrepresenting reimbursements to physicians or that the Individual Defendants did not bother to inform themselves about to Semler's marketing strategy when they made the statements in the SEC filings. In either case, the Individual Defendants had the requisite scienter.

147. The Individual Defendants also knew, or were severely reckless in not knowing, that Semler was being investigated by the DOJ for FCA violations. The 7-year investigation started in July 2017 and involved multiple civil investigative demands, which require comprehensive responses about Semler's only marketed product. The prolonged investigation would have necessarily involved attorneys' fees (whether in-house or at an external firm), which management would have monitored. This was not a one-time event but a sustained investigation over several years such that it would be absurd to suggest the Individual Defendants were not aware of it. CW 1 knew about the DOJ investigation during his tenure, which further supports the inference that the Individual Defendants were aware of it; he was a senior-level executive who recalled that the investigation began when UHG and other large health plans raised the visibility of Semler's sales practices.

## VIII. CORPORATE SCIENTER ALLEGATIONS

148. Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Semler, including each high ranking officer or director, is imputable to Semler. The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

149. Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Semler as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding Semler's only product and the Company's compliance with healthcare regulations—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## IX. CLASS ACTION ALLEGATIONS

150. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Semler common stock between March 10, 2021 and April 15, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

151. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Semler's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Semler shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Semler or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

152. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

153. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

154. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Semler; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

155. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. UNDISCLOSED ADVERSE FACTS

156. The market for Semler's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Semler's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Semler's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Semler, and have been damaged thereby.

157. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Semler's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Semler's business, operations, and prospects as alleged herein.

158. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Semler's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

159. The market for Semler's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Semler's common stock traded at artificially inflated prices during the Class Period. On October 29, 2021, the Company's share price closed at a Class Period high of $149.99 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Semler's stock and market information relating to Semler, and have been damaged thereby.

160. During the Class Period, the artificial inflation of Semler's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Semler's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Semler and its business, operations, and prospects,

thus causing the price of the Company's stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

161. At all relevant times, the market for Semler's common stock was an efficient market for the following reasons, among others:

(a) Semler shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market, and until September 2021 Semler shares traded OTC, also an efficient market;

(b) As a regulated issuer, Semler filed periodic public reports with the SEC and/or the NASDAQ;

(c) Semler regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Semler was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

162. As a result of the foregoing, the market for Semler's common stock promptly digested current information regarding Semler from all publicly available sources and reflected such information in Semler's share price. Under these circumstances, all purchasers of Semler's stock during the Class Period suffered similar injury through their purchase of Semler's stock at artificially inflated prices and a presumption of reliance applies.

163. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or

omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

164. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Semler who knew that the statement was false when made.

## XIII. CLAIMS

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

165. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

166. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Semler's stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

167. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for Semler's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

168. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Semler's financial well-being and prospects, as specified herein.

169. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Semler's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Semler and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

170. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or

directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

171. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Semler's financial well-being and prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

172. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Semler's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during

the Class Period, Plaintiffs and the other members of the Class acquired Semler's common stock during the Class Period at artificially high prices and were damaged thereby.

173. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Semler was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Semler securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's stock during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

176. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

177. The Individual Defendants acted as controlling persons of Semler within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

179. As set forth above, Semler and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

180. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: June 16, 2026

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Pavithra Rajesh*
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
csadler@glancylaw.com
prajesh@glancylaw.com

*Counsel for Plaintiffs and Lead Counsel for the Putative Class*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (31) 914-5007

*Additional Counsel for Lead Plaintiff Scott Link*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
lrosen@rosenlegal.com

*Additional Counsel for Plaintiff Sidney Woodbury*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On June 16, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 16, 2026, at Los Angeles, California.

*/s/ Pavithra Rajesh*
Pavithra Rajesh